FILED

June 23, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003585257

Scott Jordan    (SBN: 244858)
JORDAN LAW OFFICE
319 Diablo Road, Suite 202
Danville, CA 94526
Tel: (925) 362-1725
Fax: (925) 263-1905
Email: sjordan@danvillelawgroup.com

Attorney for Claimant: Marie Peters

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>**PETERS REAL ESTATE HOLDINGS, LLC**<br><br>                    Debtor(s). | Case No.: 11-24137-D11<br><br>Chapter:   11<br><br>**OBJECTION BY CLAIMANT MARIE PETERS TO CHAPTER 11 REORGANIZATION PLAN AND REQUEST FOR TIME TO FILE COMPETING PLAN** |

Claimant, Marie Peters, is a party in interest as contemplated in 11 USC §1128(b) and hereby objects to the Combined Chapter 11 Plan and Disclosure Statement filed by Michael Peters for an on behalf of Peters Real Estate Holdings, LLC (the "LLC") on May 16, 2011.

## BACKGROUND

1.      Michael Peters and Marie Peters (collectively referred to as the "Parties") were formerly married and subsequently divorced pursuant to a Marital Settlement Agreement dated May 20, 2005.

2.      The Parties created debtor Peters Real Estate Holding, LLC by way of an Operating Agreement dated September 4, 2002. (Exhibit A)

3.      Michael Peters  and Marie Peters are each 50% shareholders in Central Valley Buick, Olds, Pontiac-GMC, Inc. (the "Dealership).

4.     In combination with the divorce proceedings, the Parties entered into an amending agreement regarding the LLC on May 9, 2005. (See Exhibit B - Amendment of Peters Real Estate Holdings, LLC Operating Agreement)

5.     In further combination with the divorce proceedings, the Parties entered into stock purchase agreement wherein Michael Peters agreed to purchase Marie Peters one-half (1/2) interest in the Dealership.  (See Exhibit C - Agreement Regarding Stock)  Michael Peters has defaulted on the agreement, which is the subject of litigation between the Parties.

6.     On February 18, 2011, Michael Peters, solely and without prior written consent, caused debtor LLC to file for Chapter 11 Bankruptcy protection.

## Points and Authorities

## I.     THE CHAPTER 11 PETITION WAS NOT AUTHORIZED AND SHOULD BE DISMISSED

A party initiating bankruptcy proceedings must have the authority to do so.  <u>Price v. Gurney</u>, (1945) 324 U.S. 100, 105-107.  Determining authority is a question of state law, and in the case of a limited liability company is governed by the operating agreement, which defines the rights of members.  <u>In Re FKF Madison Park Group Owner, LLC v. Shapiro</u>, Nos. 10-11867, 10-56158, (U.S.B.C, D. Delaware January 31, 2011).

Michael Peters and Marie Peters are co-equal members of the debtor LLC under authority of an Operating Agreement dated February 12, 2002 and amended on May 9, 2005. The Operating Agreement explicitly states that "The Company, without the unanimous consent of its member, shall not file, or consent to the filing of, a bankruptcy or insolvency petition or otherwise institute insolvency proceedings." (Exhibit A, section 2.13.12, page 7)  In most operational matters, the Manager of the LLC is granted the authority to conduct the business affairs of the LLC.  The co-Managers of the LLC are Michael Peters and Marie Peters. (Exhibit B, section 1.15, page 1)

Michael Peters, through his attorney, acted on his own authority and caused this Chapter 11 petition to be filed.  A Manager of the LLC lacks the authority to file a Chapter 11 petition if the Operating Agreement prohibits such action without the unanimous consent of the Members.  <u>In re DB Capital Holding, LLC</u>, Nos. CO-10-046, 10-23242, 2010 WL 4925811 (B.A.P. 10th Cir. December 6, 2010).  In *DB Capital Holding*, the Appellate Court held that a

Objection by Claimant Marie Peters to Chapter 11 Reorganization Plan
and Request for Time to File Competing Plan

Manager lacked authority to file a Chapter 11 petition because the LLC's operating agreement contained language explicitly prohibiting the manager from taking such action. Here, the co-Manager and co-Member, Marie Peters was not consulted prior to and did not consent to the Chapter 11 petition being filed. As such, Michael Peters acted alone and without consent and therefore lacked the authority to file this proceeding on behalf of the LLC. Accordingly, since the Chapter 11 petition filing was unauthorized and beyond the scope of Michael Peters' authority, this proceeding should be dismissed pursuant to 11 USC §1112(b)(1).

## II.  THE PLAN IS MISLEADING AND FAVORS THE DEALERSHIP

The plan calls for the LLC to "assume all unexpired leases pertaining to the Dealership." (Combined Chapter 11 Plan and Disclosure Statement, section 5(a), page 9, line 9)  Beginning October 9, 2010, the lease calls for the Dealership to pay a minimum base rent of $41,200.00 per month to the LLC, which is to increase 3% on October 9, 2011 and each year beyond that until the termination of the lease on August 31, 2020. (Exhibit C, §3.3.1(b), page 12)

However, the plan allows payments to secured creditors of only approximately $30,960.81. The plan does not take into account the difference of $10,239.19 for the remainder of this year, and increasing 3% each year thereafter. Since debtor is a single asset holding company, has no other operational expenses and does not provide for the distribution of profits to its members, the reasonable conclusion is that Michael Peters intends to only charge the Dealership the $30,960.81 contemplated in the plan and no more. In doing so, Michael Peters is favoring the Dealership, a non-bankruptcy debtor, in unilaterally reducing the rent owed and thus favoring his own interests in the Dealership to the exclusion of the LLC creditors and its members.

## III.  REQUEST FOR ADDITIONAL TIME TO FILE COMPETING CHAPTER 11 PLAN

Based on information and belief, Marie Peters is informed and thereon believes that the fair market value for the land owned by the LLC is $2,300,000. Marie Peters further believes that a work-out with the secured lenders is possible if the offer to buy-out the loans is based on the fair market value of the real property. She is currently in negotiations with a potential lender for the buy-out of the secured lenders at the present fair market value and subsequent

sale of the LLC. She believes that her efforts are in the best interests of the secured lenders and the LLC. Accordingly, given that the secured lenders have not agreed to the plan as proposed, it would be in the best interest of all parties to allow her to work with Michael Peters and his attorney, to negotiate a loan and buy-out package with a willing lender and that additional time be granted to allow her to file a competing Chapter 11 plan.

### Conclusion

In conclusion, Marie Peters objects to confirmation of the current Chapter 11 plan and respectfully requests that:

1. The Court deny the proposed plan;
2. The Court dismiss this Chapter 11 proceeding; or
3. Grant the claimant additional time to file a competing plan.

Respectfully submitted,

Date:  June 22, 2011                     DANVILLE LAW GROUP

                                         By: /s/ *Scott Jordan*
                                         Scott Jordan

### Verification

I, Marie Peters, party in interest and claimant in the above entitled Chapter 11 Bankruptcy proceed, declare under Penalty of Perjury that the I have read the above Objection to Chapter 11 Reorganization Plan and Request for Time to File Competing Plan and do hereby confirm and verify the contents contained therein.

Dated: June 22, 2011               By:   /s/ Marie Peters
                                         Marie Peters

EXHIBIT A

Objection by Claimant Marie Peters to Chapter 11 Reorganization Plan
and Request for Time to File Competing Plan

# OPERATING AGREEMENT

## OF

## PETERS REAL ESTATE HOLDINGS, LLC

a California limited liability company

September 4, 2002

# OPERATING AGREEMENT

## OF

## PETERS REAL ESTATE HOLDING, LLC.
### a California limited liability company

THIS OPERATING AGREEMENT is made and entered into effective as of September **4**, 2002, by and among Michael G. Peters and Marie B. Peters, Trustees of the Michael and Marie Peters Revocable Trust dated February 12, 2002 **"Member"** or **"Members"**.

WHEREAS, the parties hereto desire to establish a limited liability company pursuant to the laws of the State of California for the purpose of owning and leasing real property;

WHEREAS, the parties hereto desire to memorialize herein all of their rights and obligations with respect to such limited liability Company;

NOW, THEREFORE, in recognition of the foregoing and in consideration for the covenants provided for herein, it is hereby agreed as follows:

## ARTICLE 1                 DEFINITIONS

1.1     1933 Act. **"1933 Act"** shall mean the Securities Act of 1933, as amended from time to time.

1.2     Act. **"Act"** shall mean the Beverly-Killea Limited Liability Company Act, Section 17000, et seq. of the California Corporations Code, as amended from time to time.

1.3     Agreement. **"Agreement"** shall mean this Operating Agreement of the Company as amended from time to time.

1.4     Articles. **"Articles"** shall mean the Articles of Organization of the Company filed with the Secretary of State of the State of California, together with any and all amendments and restatements thereto, which are filed pursuant to the Act.

1.5     Capital Account. **"Capital Account"** shall mean an account established and maintained on the books of the Company for each Member pursuant to Section 3.1 of this Agreement.

1.6    Capital Contribution. **"Capital Contribution"** shall mean the cash contribution made or to be made by any Member to the Company and the fair market value of any property (other than money) contributed or to be contributed by any Member o the Company, net of liabilities secured by such contributed property which the Company is considered to assume or take subject to pursuant to Section 752 of the Code.

1.7    Code **"Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time and any successor statute. Any reference herein to a particular provision of the Code shall mean, where appropriate, the corresponding provision of any successor statute.

1.8    Company. **"Company"** shall mean Peters Real Estate Holdings, LLC, a California limited liability company, formed under this Agreement and the Articles pursuant to the Act.

1.9    Distributable Cash. **"Distributable Cash"** shall mean at the time of determination the amount of cash which the Manager deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, working capital and other amounts which the Manager deems necessary or appropriate for the Company's business, and reserves in such amounts as the Manager deems necessary or appropriate. Distributable Cash shall not include any cash, the distribution of which would cause the Company to be insolvent or unable to pay its obligations as such obligations become due or are scheduled to be paid.

1.10    Expenses. **"Expenses"** shall mean, without limitation, attorneys' fees, disbursements and retainers, court costs, transcript costs, fees of accountants, experts and witnesses, travel expenses, duplication costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other expenses of the types customarily or reasonably incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness or other participant in any judicial or administrative proceeding or deposition associated therewith.

1.11    Lender. **"Lender"** shall mean Falcon Financial LLC and/or its successors and assigns.

1.12    Income and Loss. **"Income"** and **"Loss"** shall mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined by the Company's accountants in accordance with the principles of Code Section 703(a), and for this purpose all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss.

1.13    Indemnitee **"Indemnitee"** shall mean each Member, including the Manager, and each employee and agent of the Company and, with respect to each Member, the shareholders, members, partners, directors, officers, employees and agents of such Member.

1.14   Loan: "**Loan**" Shall mean that certain Loan made by Lender in favor of Company and all interest thereon and other sums owed to Lender, its successors and assigns pursuant to the documents which evidence and secure the Loan secured by the Property.

1.15   Manager. "**Manager**" shall mean Michael Peters and Marie Bressler Peters acting jointly or any successor thereto appointed in accordance with this Agreement.

1.16   Member. "**Member**" shall mean the Manager and each other Person who has been admitted to the Company as a Member in accordance with the provisions of this Agreement, who has not ceased to be a Member.

1.17   Percentage Interest. "**Percentage Interest**" shall mean, Michael and Marie Peters Revocable Trust dated February 12, 2002, 100%.

1.18   Person. "**Person**" shall mean any individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, association or other entity.

1.19   Property. "**Property**" shall mean that certain real property commonly known as 1190 South Main Street, Manteca, San Joaquin County, California.

1.20   Regulations. "**Regulations**" shall mean the regulations at the time of determination which have been issued by the U.S. Department of Treasury pursuant to its authority under the Code and which are enforced as final or temporary regulations.

## ARTICLE 2         ORGANIZATIONAL MATTERS

2.1   Formation. The Members hereby establish the Company, and each Person executing this Agreement as a Member of the Company hereby agrees to be bound by all of the terms and provisions of this Agreement. The Company has been formed as a California limited liability company pursuant to the provisions of the Act. The rights and liabilities of the Members shall be as provided in the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than would be the case in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

2.2   Name. The name of the Company is "**Peters Real Estate Holdings, LLC**". The business of the Company shall be conducted under such name, or such other name or names as may from time to time be designated by the Manager. The Manager shall undertake or cause to be undertaken all action as may be necessary or appropriate to complete the adoption of any different or additional name or names of the Company as may hereafter be adopted by the Manager, including without limitation, the execution and filing of an appropriate amendment to the Certificate and such other documents or instruments as may be required by applicable law.

- 3 -

2.3    Purpose and Powers

2.3.1    Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(i)    To acquire a leasehold interest and/or fee interest in that certain parcel of real property, together with all improvements located at 1190 South Main Street, Manteca, California (the "Property").

(ii)    To own, hold, sell, assign, transfer, operate, lease, mortgage, pledge and otherwise deal with the Property.

(iii)    To borrow the Loan (defined below) and to issue notes and other documents to evidence and secure the Loan.

(iv)    Subject to the Separateness Covenants (defined below), to exercise all powers enumerated in the Limited Liability Company Act of California necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

2.4    Term  The term of the Company commenced upon filing of the Articles with the California Secretary of State on August 22, 2002, and the Company shall continue thereafter through and including December 31, 2050 unless the existence of the Company is earlier terminated as provided in this Agreement or by operation of law or extended pursuant to an amendment to this Agreement.

2.5    Fictitious Business Name Certificates.  The Manager shall execute and cause to be recorded fictitious business name, trade name or other similar certificates as, when and where required pursuant to applicable law.

2.6    Registered Office and Agent.  The Company shall continuously maintain a registered office and registered agent in the State of California. The initial registered agent and office is as set forth in the Articles. The Company may from time to time change the registered agent and office as the Manager may elect.

2.7    Business Offices.  The principal place of business of the Company shall be located at 1190 South Main Street, Manteca, California or such other place in the Continental United States as the Manager may from time to time hereafter determine. The Company shall have such additional offices as the Manager may determine from time to time or the business of the Company may require.

2.8    Title to Assets.  All assets of the Company, whether real or personal, tangible or

– 4 –

intangible, shall be deemed to be owned by the Company as an entity, and no Member shall have an ownership interest in such assets solely be reason of being a Member, other than as provided in this Agreement. Title to all assets of the Company shall be held in the name of the Company or its designated nominee, and each of the Members shall execute, acknowledge, record and file any and all instruments as may be necessary or appropriate to evidence the ownership of such assets by the Company.

2.9 <u>Non-foreign Status</u>. The Manager shall have the right from time to time in its discretion to require that each Member either (i) provide to the Company reasonably satisfactory evidence that such Person is (a) not a foreign Person, as such term is defined in Regulations Section 1.897-1(k) and (b) is a California resident or, if a corporation, has a permanent place of business in California or (ii) provide to the Company written notice that such Person does not satisfy the requirements of sub-paragraphs (a) or (b) herein. Provision of a Certificate of California Residence as provided by Regulations Section 1.1445-2(b)(2) shall be deemed to constitute satisfactory evidence of non-foreign status. Submission of a Certificate of California Residence - FTB Form 590 shall be deemed satisfactory evidence of California residency or with respect to a corporation, the existence of a permanent place of business for such corporation in California.

2.10 <u>Members</u> The name and address of each of the Members are set forth on Schedule 2.10 attached.

2.11 <u>Independent Activities</u>. Nothing herein shall preclude a Member, (or any shareholder, partner, member, director, officer, employee or Affiliate of any Member) either directly or indirectly, from engaging in or possessing an interest in any other business of any kind or description. Neither the Company nor any Member shall, by reason of this Agreement, hold any interest or right to any such other business, or any proceeds or profits derived therefrom without regard to whether any such other business is competitive with the business of the Company. No Member shall be obligated to present any investment opportunity or prospective economic advantage to the Company or any other Member. Each Member shall have the right to hold any investment opportunity or prospective economic advantage for such Member's own account, or to recommend such opportunity to Persons other than the Company.

2.12 <u>No Liability</u>. No Member, and no person who is a Manager or officer or both a Manager and officer, of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member, Manager or officer or both a Manager and officer of the Company.

2.13 <u>Single Purpose Entity/Separateness</u>. As long as the Loan to the Company remains outstanding, the Company will abide by the following covenants (the Separateness Covenants):

2.13.1  The Company will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.

2.13.2  The Company will not engage in any business other than the ownership, management and operation of the Property and the Company will conduct and operate its business as presently conducted and operated.  The Company will not engage in any other business activity without the unanimous consent of its members.

2.13.3  The Company will not enter into any contract or agreement with any affiliate of the Company, any constituent part of the Company, any guarantor ("Guarantor") of the Loan or any affiliate of any constituent party or Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

2.13.4  The Company will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (i) the Loan and (ii) unsecured trade and operational debt incurred in the ordinary course of business with trade creditors in amounts as are normal and reasonable under the circumstances.  No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Property.

2.13.5  The Company will not make any loans or advances to any third party (including any affiliate or constituent party, any Guarantor or any affiliate of any constituent party or Guarantor) or pledge its assets for the benefit of any third party, and shall not acquire obligations or securities of its affiliates or any constituent party.

2.13.6  The Company will remain solvent and the Company will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

2.13.7  The Company will do all things necessary to observe organizational formalities and preserve its existence, and the Company will not amend, modify or otherwise change the articles of organization, limited liability company agreement, or other organizational documents of the Company without the prior written consent of the holder of the Loan and all securities secured thereby and the unanimous consent of the members of the Company.

2.13.8  The Company will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates, any constituent party or Guarantor and the Company will file its own tax returns.  The Company shall maintain its books, records, resolutions and agreements as official records.

2.13.9  The Company will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of the Company, any constituent party of the Company, any Guarantor or any affiliate of any constituent party or Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall

– 6 –

conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other, shall maintain and utilize a separate telephone number and separate stationery, invoices and checks, shall maintain an office through which its business shall be conducted separate and apart from those of its parent, Guarantor or constituent party and shall allocate fairly and reasonably any overhead for shared office space.

2.13.10    The Company will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

2.13.11    Neither the Company nor any constituent party will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of the Company, or sale of all or substantially all of the Company's assets without the unanimous consent of its members.

2.13.12    The Company, without the unanimous consent of its members, shall not file, or consent to the filing of, a bankruptcy or insolvency petition or otherwise institute insolvency proceedings.

2.13.13    The Company will not commingle the funds and other assets of the Company with those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person.

2.13.14    The Company will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person.

2.13.15    The Company will not assume or guarantee or hold itself out to be responsible for the debts or obligations of any other person.

2.13.16    In the event of the occurrence of any event which results in the termination of the Company, the vote of a majority of the remaining members shall be sufficient to continue the existence of the Company, and if such vote is not obtained, the Company may not liquidate the assets of the Company without the consent of the holder of the Loan and all securities secured thereby.

2.13.17    The Company shall at all times be qualified to do business in the state where the Property is located.

2.13.18    The members of the Company will consider the interests of creditors in connection with all corporate actions.

2.13.19    The Company shall pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

# ARTICLE 3       CAPITAL ACCOUNTS; ADVANCES

## 3.1    Capital Accounts.

3.1.1  A Capital Account shall be established and maintained for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv) and this Section 3.1.

3.1.2  In the event that (i) property other than cash is contributed by a Member to the Company or (ii) if the Manager, in its sole discretion, determines that the Company's property should be revalued, the adjustments required by Regulations Section 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i) shall be made to the Members' Capital Account.

3.1.3  In the event that property is distributed or deemed distributed by the Company to a Member, the Capital Accounts of the Members shall be adjusted as provided in Regulations Section 1.704-1(b)(2)(iv)(e) to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property that has not already been reflected in the Members' Capital Accounts would be allocated if there were a taxable disposition of the property for its fair market value on the date of such distribution.

3.1.4  Any Member who shall receive an interest in the Company from another Member or whose interest in the Company shall be increased by means of a transfer to it of all or any part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account attributable to such interest in the hands of the Member from whom such interest is acquired, except as otherwise required to account for any step-up in basis resulting from a Code Section 708 termination of the Company by reason of said interest transfer.

3.1.5  In the event that it is necessary to determine the Capital Account of any Member for any purpose, the Capital Account of such Member shall be determined after giving effect to all allocations of items of income, gain, loss, deduction and credit realized by the Company and all distributions of cash and property occurring prior to the date such determination is made.

## 3.2    Advances.

3.2    Advances.  Members may from time to time, but shall not be required to, advance monies to the Company upon the consent of the Manager to fund the liabilities and operating expenses of the Company to the extent that such liabilities and operating expenses exceed Company cash.  In the event that the Manager determines that additional funding is required by the Company, the Manager may provide notice to each of the Members of the need for advances to the Company. Each Member desiring to participate in providing advances to the Company shall have the right to participate therein.  All such advances (except advances contributed as Capital Contributions) shall constitute loans to the Company which are repayable, together with interest at such reasonable rate as may be agreed upon between the Manager and lending Members.  Any unpaid advances shall become immediately due and payable in full upon termination and dissolution of the Company.

# ARTICLE 4          CAPITAL CONTRIBUTIONS

4.1     Capital Contributions.  Each Member shall make the Capital Contribution to the Company in the amount set forth after the name of such Member in Schedule 4.1 attached.

4.2     Additional Capital Contributions.  The Manager may, in the Manager's sole and absolute discretion, determine from time to time that the Company requires additional Capital Contributions.  In the event that the Manager makes such determination, then the Manager shall provide written notice of the need thereof to each Member of the Company.  Each Member shall then have the right, but not the obligation, to make additional Capital Contributions to the Company.

4.3     Membership Interests Fully Paid.  Each ownership interest in the Company shall upon issuance by the Company be fully paid and non-assessable.

4.4     Limitations.  No Member shall be entitled to withdraw any portion of its Capital Contributions or Capital Account, or to receive any distribution from the Company, except as specifically provided in this Agreement or in the Act.


# ARTICLE 5          DISTRIBUTIONS AND ALLOCATIONS

5.1     Distributable Cash.  Distributable Cash, if and when available, shall be distributed at such times and in such amounts as may from time to time be determined by the Manager in his sole and absolute discretion to the Members in proportion to their respective Percentage Interests.

5.2     Income.  Income shall be allocated among the Members in proportion to their respective Percentage Interests.

5.3     Loss.  Loss shall be allocated among the Members in proportion to their respective Percentage Interests.

5.4     In-Kind Distributions.  Any non-cash assets realized by the Company in connection with the sale or other disposition of Company assets, may be distributed in-kind to the Members or to a collection account established for the purpose with any proceeds realized by such account to be distributed in accordance with the terms of this Article.  The fair market value of any assets distributed in-kind shall be as reasonably established by the Manager.

5.5     Consent by Members.  The methods by which income, gain, loss, deduction and distributions are allocated and apportioned are hereby expressly consented to by each Member.

**ARTICLE 6**                                    **MEMBERS**

6.1     Limited Authority. Each Member acknowledges that the Members shall have no right to participate in the management or control of the business and affairs of the Company, and shall exercise only those voting rights as are specifically provided for in this Agreement. No Member shall be an agent of the Company or have the power or authority to bind the Company other than upon the express prior direction of the Manager, or as set forth in Article 7 below. Members, in accordance with the provisions of Section 6.2 below, shall have the right to vote solely with respect to those matters set forth immediately below, and on no other matters:

6.1.1   The amendment of this Agreement, other than in connection with the admission of any Person as a Member or Substitute Member of the Company;

6.1.2   The dissolution of the Company;

6.1.3   The merger, consolidation or combination of the Company with any other entity; and

6.1.4   The selection of a replacement Manager in accordance with the provisions of Section 7.5.

6.2     Approval of Members. All matters upon which the Members have a right to vote shall be deemed adopted solely upon the approval thereof by the Manager and those Members holding a majority of the Percentage Interests.

6.3     Meetings. No annual or regular meetings of Members are required. Meetings of the Members may be called at any time by the Manager or by any Member or Members holding Percentage Interests aggregating more than ten percent (10%). Notice of each meeting of the Members shall be given to each Member by the Manager not less than ten (10) business days nor more than sixty (60) days prior to the date of such meeting. Each notice hereunder shall specify the place, date and hour of the meeting, and the general nature of the business to be transacted. Any Member may attend a meeting by telephone. Further, any Member may grant a proxy to another Member or other Person to exercise all the voting rights attributable to such granting Member. Attendance at a meeting, whether in person, by telephone or by proxy, shall constitute a waiver of notice of that meeting.

6.4     Action By Written Consent. Any action that may be taken at a meeting of the Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is executed by those Members required to approve the proposed action as provided in Section 6.2 above.

**ARTICLE 7**                                    **MANAGEMENT**

– 10 –

7.1    Manager. Subject to the provisions of Section 6.1 above, the Manager shall have the complete and exclusive authority and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding the business of the Company and to undertake any and all acts necessary, appropriate or convenient in connection with or incidental to the management of the Company's business, property and affairs. The Manager shall possess all of the rights and powers necessary and appropriate to perform all of its duties hereunder. No Members shall participate or interfere in any manner in the exercise by the Manager of the Manager's rights and powers hereunder.

7.2    Powers of Manager. The Manager shall have all necessary powers to manage and carry out the purposes, business and affairs of the Company. Without in any manner limiting the generality of any other provision of this Agreement, the Manager shall have the power to do each of the following upon terms and conditions as determined by the Manager:

7.2.1    Authorize, approve, perform or cause to be performed all actions in furtherance of or related to the purposes of the Company;

7.2.2    Enter into, amend and extend one or more franchise agreements with the appropriate manufacturers of the automobiles intended to be sold by the Company;

7.2.3    Exercise all of the rights, powers and authority granted to the Company pursuant to each franchise agreement entered into by the Company;

7.2.4    Enter into, amend and extend a lease as landlord for the premises at which the Company intends to lease its real property upon such terms as are approved by the Manager;

7.2.5    Acquire, purchase, lease, partition, renovate, improve, alter, rebuild, demolish, replace and own property, real and/or personal, as the Manager determines from time to time to be necessary or appropriate or in the interest of the business of the Company, and to acquire options for the lease or purchase of any such property, upon terms and conditions as determined from time to time by the Manager;

7.2.6    Assume or acquire assets subject to, debts, obligations and liabilities of any nature;

7.2.7    Sell, exchange, lease or otherwise dispose of any property, real or personal, tangible or intangible, or any part thereof or any interest therein;

7.2.8    Borrow money from any party, including the Manager or any affiliate of the Manager or any Member or affiliate of any Member, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend or change the terms of, or extend the

- 11 -

time for the payment of any indebtedness or obligation of the Company, and secure such indebtedness by mortgage, deed of trust, pledge, security interest or other lien on Company assets;

7.2.9   Hire such employees as the Manager from time to time deems necessary or appropriate or in the interest of the business of the Company upon such terms and conditions as the Manager deems appropriate;

7.2.10  Terminate the employment of any employee including the property manager of any premises owned by the Company at such time and upon such terms as the Manger deems appropriate;

7.2.11  Establish and control the systems, internal controls and marketing programs of the business of the Company including without limitation operating systems, financial controls, pricing policies and marketing programs;

7.2.12  Establish such benefit plans and programs, including without limitation medical, life insurance and retirement plans, as the Manager from time to time deems appropriate;

7.2.13  Acquire and maintain such insurance from time to time as the Manager deems appropriate and in the interest of the business of the Company;

7.2.14  Establish such reserves as the Manager from time to time deems appropriate and in the interest of the business of the Company;

7.2.15  Cause the Company to guarantee the payment of money or the performance of any contract or obligation of any Person;

7.2.16  Establish such checking, savings, money-market and other accounts at such financial institutions as the Manager may select from time to time and designate the individuals with the power to sign for such accounts;

7.2.17  Cause the Company to maintain its books and records and to prepare all necessary or appropriate federal, state and local returns, exercise all elections for tax purposes and revalue the assets of Company in accordance herewith;

7.2.18  Sue on, defend or compromise any and all claims or liabilities in favor of or against the Company, submit any or all such claims or liabilities to arbitration, confess a judgment against the Company in connection with any litigation to which the Company is involved; and

7.2.19  Retain legal counsel, auditors and other professionals in connection with the Company business and pay therefor such remuneration as the Manager may determine.

7.3     Execution of Documents.  The Manager may execute, acknowledge and deliver

documents, agreements, contracts and other instruments of any nature whatsoever in the name and on behalf of the Company which signature shall be binding upon the Company and may be relied upon by third parties.

7.4    Devotion of Time  The Manager is obligated to devote that portion of its time and efforts to the business of the Company as the Manager may in its discretion determine from time to time to be necessary or appropriate.

7.5    Replacement of Manager.  In the event that the Manager shall for any reason withdraw from the position of Manager, then a new Manager shall be appointed upon the vote of the Members in accordance with the provisions of Sections 6.1 and 6.2.

7.6    Financing.  The Manager shall arrange for such financing as may from time to time be required by the Company, including without limitation flooring financing and working capital financing.

7.7    Other Employees.  The Company shall engage such employees, upon such terms, as the Manager from time to time deems appropriate and in the interest of the business of the Company.


**ARTICLE 8          ACCOUNTING, RECORDS**

8.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of the Company's operations recorded, in accordance with the Company's accounting policies.  The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain at its executive offices all of the following books and records of the Company:

8.1.1    A current record of the full name and last known business or residence address of each Member, set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest for each Member;

8.1.2    A current list and full name and last known business or residence address of each Manager;

8.1.3    A copy of the Articles;

8.1.4    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

8.1.5    A copy of this Agreement and any and all amendments thereto;

- 13 -

8.1.6    Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

8.1.7    The Company's books and records (including minutes of Member meetings) as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

8.2    Delivery to Members and Inspection.  Upon the request of any Member for purposes reasonably related to the interest of that Person as a Member the Manager shall promptly deliver to the requesting Member, at the expense of the Company, a copy of the information required to be maintained under Sections 8.1.1, 8.1.2 and 8.1.4 above.  Further, upon the request of any Member for purposes reasonably related to the interest of that person as a Member, such Member shall have the right to inspect and copy during normal business hours any of the records described in Sections 8.1.1 through 8.1.7 above.

8.3    Tax Information.  The Manager shall cause to be prepared, at least annually, at Company expense, the information necessary for the preparation of the Members' federal and state returns.  The Manager shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income or information returns, together with a copy of the Company's federal, state and local income tax or information returns for that year.

8.4    Filings.  The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities.  The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other applicable laws, rules and regulations.

8.5    Funds of the Company.  The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Manager or any other Person.  All expenses incurred for the benefit of the Company shall be paid by the Company.

8.6    Accounting Decisions and Reliance on Others.  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager.

8.7    Tax Matters.  The Manager shall from time to time cause the Company to make such tax elections as the Manager deems to be in the best interests of the Company and the Members.  The Manager shall act as the **"Tax Matters Partner"** as defined in Section 6231(a)(7) of the Code and shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and

– 14 –

costs associated therewith. The Manager shall oversee the Company tax affairs in the overall best interest of the Company.


## ARTICLE 9        DISSOLUTION OF THE COMPANY

9.1    Dissolution. The Company shall be dissolved, its assets disposed of, and its affairs wound up on the first to occur of the following:

       9.1.1    The expiration of the term of the Company, unless the Members elect to extend the term of the Company by Amendment of this Agreement;

       9.1.2    The sale of all or substantially all of the Company's assets;

       9.1.3    The affirmative vote of the Members to dissolve the Company;

       9.1.4    The entry of a decree of judicial dissolution pursuant to the Act;

       9.1.5    At such time as there are less than two Members;

9.2    Winding Up   Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Manager shall file with the Secretary of State of the State of California a certificate of dissolution for the Company, shall be responsible for overseeing the winding up and liquidation of the Company, shall take a full account of the liabilities of the Company and its assets, and may cause its assets to be sold or distributed and if sold shall cause the proceeds therefrom, to be applied and distributed as provided in Section 9.3 below. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company.

9.3    Order of Payment Upon Dissolution.   After determining that all known debts and liabilities of the Company, including without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account Income and Loss allocations for the Company's taxable year during which liquidation occurs. Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

9.4    Limitations on Payments Made in Dissolution.   Except as otherwise specifically provided in this Agreement each Member shall only be entitled to look solely at the assets of the Company for the return of such Member's positive Capital Account balance and shall have no

– 15 –

recourse for such Member's Capital Contribution and/or share of Distributable Cash (upon dissolution or otherwise) against the Manager or any other Member.

9.5    <u>No Dissolution on Bankruptcy</u>. Notwithstanding any other provision of this Agreement, the Company shall not dissolve upon the bankruptcy of any Member.

9.6    <u>Continuation of Company</u>. Upon the occurrence of an event specified in Section 9.1, the vote of a majority of the remaining Members is sufficient to continue the life of the Company.

9.7    <u>Limits on Dissolution</u>. Notwithstanding any provision hereof to the contrary, the following shall govern: Subject to applicable law, dissolution of the Company shall not occur so long as the Loan in favor of the Company remains outstanding.

## ARTICLE 10    INDEMNIFICATION AND INSURANCE

10.1    <u>Exculpation</u>. No Indemnitee shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or omission performed or omitted in good faith on behalf of the Company and in a manner not constituting willful misconduct or fraud.

10.2    <u>Indemnification</u>. The Company shall indemnify, defend and hold harmless each Indemnitee from and against all loss or liability of any nature whatsoever, including without limitation any and all claims or threats thereof, Expenses and liabilities and threats thereof, which such Indemnitee may incur or which may be threatened against such Indemnitee, by reason of such Indemnitee occupying any position listed in the definition of Indemnitee set forth in Section 1.12 (regardless of the disclosure or lack of disclosure of such status) or by virtue of taking any action pursuant to this Agreement in such capacity unless such claim, Expense or liability is caused by an act or omission performed or omitted by the Indemnitee in a manner which constitutes willful misconduct, fraud or gross negligence. Expenses incurred by an Indemnitee in connection with any matter that may be subject to indemnification hereunder, may be advanced by the Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified by the Company as authorized in this Article 10.

10.3    <u>Indemnity Not Exclusive</u>. The indemnification and advancement of Expenses provided by the provisions of this Article 10, shall not be deemed exclusive of any other rights to which any Indemnitee may be entitled under any agreement, or otherwise.

10.4    <u>Insurance</u>. The Company may, in the sole and absolute discretion of the Manager, purchase and maintain insurance on behalf of any Indemnitee against any liability to which the indemnification obligation of this Article 10 may extend.

10.5    <u>Heirs, Executors and Administrators</u>. The indemnification and advancement of Expenses provided by, or granted pursuant to this Article 10 shall inure to the benefit of the heirs, executors and administrators of each Indemnitee. The obligations of the Company set forth in this Article 10 shall apply for the benefit of each Indemnitee throughout the entire period that

- 16 -

such Indemnitee occupies a position with the Company that causes such Indemnitee to come within the definition of "Indemnitee" hereunder, and shall continue thereafter so long as such Indemnitee may be subject to any possible action by reason of a prior status as an Indemnitee.

10.6    Indemnification. Notwithstanding any provision hereof to the contrary, the following shall govern: Any indemnification shall be fully subordinated to any obligations respecting the Property and shall not constitute a claim against the Company in the event that cash flow is insufficient to pay such obligations

## ARTICLE 11                MISCELLANEOUS

11.1    Successors. This Agreement shall be binding on and shall inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors, and permitted assigns, provided that no benefit shall inure to Assignees acquiring any interest in violation of the provisions of this Agreement.

11.2    Captions. Paragraph titles or captions contained in this Agreement are inserted as a matter of convenience only and for reference, and in no way define, limit, extend or describe the scope of this Agreement.

11.3    Severability. In the case that any one or more of the provisions contained in this Agreement are for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

11.4    Controlling Law. This Agreement shall be governed by and be construed according to the internal laws of the State of California without reference to any principles of conflicts of law.

11.5    Number; Gender. Whenever required by the context hereof, the singular shall include the plural, and vice versa, and the masculine gender shall include the feminine and neuter genders, and vice versa.

11.6    Notices. All notices, requests or demands to a party hereunder shall be in writing and shall be given or served upon the other party by personal service, by certified return receipt requested or registered mail, postage prepaid, or by Federal Express or other nationally recognized commercial courier, charges prepaid, to the address set forth on Schedule 2.10 attached hereto. Any such notice, demand, request or other communication shall be deemed to have been received upon the earlier of personal delivery thereof, three (3) business days after having been mailed as provided above, or one (1) business day after delivery to a commercial courier for delivery on the immediately following business day, as the case may be. Notices may be given by facsimile and shall be effective upon the transmission of such facsimile notice provided that the facsimile notice is transmitted on a business day and a copy of the facsimile notice together with evidence of its successful transmission indicating the date and time of transmission is sent on the day of transmission by recognized overnight carrier for delivery on the

immediately succeeding business day. Each party shall be entitled to modify its address by notice given in accordance with this Section 11.6.

11.7   Time. Time is of the essence in the performance of each party's obligation hereunder.

11.8   No Waiver. No waiver by any party of the performance or satisfaction of any covenant or condition shall be valid unless in writing and shall not be considered to be a waiver by such party of any other covenant or condition hereunder.

11.9   Schedules. All schedules attached hereto shall be incorporated herein by reference as if set out herein in full.

11.10   Entire Agreement. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the parties.

11.11   Amendments. No amendment to this Agreement shall be valid or binding unless set forth in writing and duly executed by each of the parties to this Agreement.

11.12   Counterparts. This Agreement, and any amendment hereto, may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument and shall be binding on the parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile also shall deliver a manually executed counterpart of this Agreement, but failure to deliver a manually executed counterpart shall not affect the validity, enforce ability or binding effect of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Limited Liability Company Agreement of PETERS REAL ESTATE HOLDING, LLC, a California limited liability company, to be executed as of the day and year first above written.

**MEMBER:**

Michael and Marie Peters Revocable Trust
dated February 12, 2002

By: _____      By: _____
      Michael G. Peters, Trustee            Marie B. Peters, Trustee

## Schedule 4.1

## Capital Contributions

Michael and Marie Peters Revocable Trust dated February 12, 2002      $_____

EXHIBIT B

Objection by Claimant Marie Peters to Chapter 11 Reorganization Plan
and Request for Time to File Competing Plan

## AMENDMENT OF PETERS REAL ESTATE HOLDINGS, LLC
## OPERATING AGREEMENT

This Amendment of the Operating Agreement of Peters Real Estate Holdings, LLC, (the "Operating Agreement") is entered into and made effective as of May 9, 2005.

## RECITALS

A.      The Operating Agreement was made and entered into effective as of September 4, 2002 by and among Michael G. Peters and Marie B. Peters, Trustees of the Michael and Marie Peters Revocable Trust dated February 12, 2002 as the Member of the LLC. A copy of the Operating Agreement is attached hereto.

B.      The parties are no longer married and each desire the Members of the LLC to be Michael G. Peters *[Trustee?]* and Marie B. Peters, as Trustee of the Marie B. Peters 2004 Family Trust, with each Member owning a 50% Percentage Interest in the LLC.

C.      The parties also desire Michael G. Peters and Marie B. Peters acting jointly to continue as the Manager of the LLC.

## AGREEMENT

The parties hereby agree as follows:

1.      Paragraph 1.15 of the Operating Agreement is amended to read:

"1.15   Manager. "Manager" shall mean Michael G. Peters and Marie B. Peters, acting jointly, or any successor thereto, appointed in accordance with this Agreement. Any and all powers to be exercised by the Manager and actions taken by the Manager shall require the prior written consent of the both Michael G. Peters and Marie B. Peters, which consent may be granted or withheld in the sole discretion of each."

2.      Paragraph 1.16 of the Operating Agreement is amended to read:

"1.16   Members. "Members" shall mean Michael G. Peters *[Trustee?]* and Marie B. Peters, Trustee of the Marie B. Peters 2004 Family Trust."

3.      Paragraph 1.17 of the Operating Agreement is amended to read:

1

"1.17  Percentage Interests.  "Percentage Interests" shall mean 50% owned by Michael G. Peters *[Trustee?]* and 50% owned by Marie B. Peters, Trustee of the Marie B. Peters 2004 Family Trust."

4.  Effectiveness of Operating Agreement.  Except as set forth in this Amendment, all the provisions of the Operating Agreement shall remain unchanged and in full force and effect.

_____
Michael G. Peters *[individually and as Trustee?]*
Member and Co-Manager

_____
Marie B. Peters, individually and as Trustee of
the Marie B. Peters 2004 Family Trust
Member and Co-Manager

2

EXHIBIT C

# AGREEMENT REGARDING STOCK

This AGREEMENT REGARDING STOCK ("**Agreement**") is made and entered into as of May 25, 2005 (the "**Reference Date**"), by and among Marie B. Peters ("Seller"), Michael G. Peters ("**Buyer**"), and Central Valley Buick, Olds, Pontiac-GMC Inc., a California corporation ("**Corporation**").

## RECITALS:

This Agreement is made with reference to the following facts and circumstances:

A.     Seller and Buyer are former spouses who previously have dissolved their marriage. Pursuant to such marital dissolution, Seller and Buyer entered into that certain post-marital property agreement dated June 1, 2001, whereby they agreed to divide some, but not all, of their marital property (the "**Property Agreement**"). In entering into this Agreement, Seller and Buyer intend to fully and finally provide for the division of their marital property interests in the Corporation and its business, as well as in the related automotive reinsurance company that they jointly own, which is described in Recital D. Accordingly, Buyer and Seller intend that this Agreement shall constitute an amendment to the Property Agreement.

B.     The Corporation is an automobile dealership pursuant to that certain General Motors Sales and Service Agreement between the Corporation and General Motors Corporation (the "**Dealership Agreement**"). The Corporation conducts its business at 1190 S. Main Street, Manteca, California (the "**Dealership Location**").

C.     Seller and Buyer are the sole shareholders of the Corporation. As of the Reference Date, there are 1600 shares of outstanding common stock of the Corporation, with Seller owning 800 shares of such stock as her sole and separate property (the "**Seller's Dealership Shares**"), and Buyer owning 800 shares of such stock as his sole and separate property. Seller and Buyer are the officers and directors of the Corporation.

D.     As of the Reference Date, Seller and Buyer also jointly own the capital stock, and serve as the officers and directors, of Peters Automotive Reinsurance Co. Ltd., a Turks & Caicos Islands corporation that is in the business of providing certain automotive warranty insurance policies to the Corporation's customers (the "**Insurance Company**"). Seller owns one thousand two hundred fifty (1,250) shares of the capital stock of the Insurance Company as her sole and separate property ("**Seller's Insurance Shares**"), which constitutes one-half of all issued and outstanding Insurance Company shares; and Buyer owns one thousand two hundred fifty (1,250) shares of the capital stock of the Insurance Company as his sole and separate property, which constitutes one-half of all issued and outstanding Insurance Company shares.

E.     As used in this Agreement, the term "**Seller's Stock**" means Seller's Dealership Shares and Seller's Insurance Shares, collectively.

F.     Seller and Buyer intend that Seller's transfer of Seller's Stock and related rights to Buyer pursuant to this Agreement is a transfer "incident to the divorce", as that terminology is used in Section 1041 of the Internal Revenue Code of 1986, as amended (the "**IRC**"), and in the Treasury Regulations promulgated pursuant thereto (the "**Regs.**").

G.     Seller and Buyer jointly own and hold all outstanding membership interests in and to Peters Real Estate Holdings, LLC, a California limited liability company ("**REH LLC**"). With the exception of the modifications set forth in that certain Amendment of Peters Real Estate Holdings, LLC Operating Agreement in the form attached hereto as Exhibit "H" (the "**Amendment to Operating Agreement**"), nothing in this Agreement is intended to affect or change the ownership interests of Seller and Buyer in REH LLC or their respective membership and management rights under REH LLC's operating agreement.

H.     REH LLC owns and holds title to the real property and improvements that constitute the Dealership Location (the "**Dealership Realty**"). Pursuant to that certain Lease Agreement entered into effective as of September 27, 2002, the Corporation, as "Tenant", leases the Dealership Realty from REH LLC, as "Landlord" (the "**Lease**").

I.     The parties intend to provide for timely repayment of that certain Falcon Financial, LLC Loan Agreement dated September 2002, by and among Falcon Financial LLC, a Delaware limited liability company, as "Lender", REH LLC, as "Borrower", and the Corporation, as "Guarantor", in the original principal amount of Five Million One Hundred Fifty Thousand Dollars ($5,150,000). The indebtedness outstanding under such Loan Agreement is referred to herein as the "**Falcon Financial Loan**", and such indebtedness matures on October 1, 2009.

J.     In conjunction with the transactions contemplated by this Agreement, Seller and Buyer have agreed to cause REH LLC (a) to enter into an amendment to the Lease Agreement as more fully provided for herein; and (b) to permit Buyer to use the Dealership Realty as collateral security for new loans to repay the Falcon Financial Loan on or before its maturity, and to pay the balloon payment under the Promissory Note described in Section 2.3.2 below on or before its maturity. As a quid pro quo for permitting Buyer to so utilize the Dealership Realty as collateral security for the foregoing purposes, Buyer is willing to become primarily liable, in the place of REH LLC, for the timely and full repayment of the Falcon Financial Loan.

K.     As used in this Agreement, the following terms have the meanings ascribed to them below:

(i)     A "**business day**" means any day that federal or state chartered banks or financial institutions are open for business in San Joaquin County, California, excluding Saturdays and Sundays.

(ii)     "**Closing**" means the exchange of consideration and signed documents necessary to effectuate the asset transfer transactions contemplated by this Agreement.

(iii)     "**Closing Agent**" means the law firm of Robbins, Palmer & Allen, LLP.

(iv) **"Closing Date"** means a date that is two (2) business days after the date that the Closing Agent receives the last document required to be delivered by the parties in accordance with Section 10.3, or such earlier or later date that the parties may mutually agree to in writing; provided, however, that such date shall not be later than May 31, 2005.

(v) **"Effective Date"** means May 9, 2005.

(vi) **"Insolvent"** means (1) that a party's current liabilities exceed current assets; or (2) a party is, or as a result of the transaction contemplated by this Agreement would be, likely to be unable to meet its liabilities as they mature.

(vii) **"MSA"** means that certain Marital Settlement Agreement by and between Buyer, as "Husband" or "Father", and Seller, as "Wife" or "Mother", currently under negotiation between the parties respecting the final and complete settlement of rights and obligations arising out of the parties' marriage, including their respective child custody and visitation rights, residual property rights, and support rights.

(viii) **"Neutral Accountant"** means an independent public accountant who has knowledge and experience in accounting and tax matters applicable to automotive dealerships.

(ix) **"Section 1041"** means Section 1041 of the IRC and the Regs. promulgated pursuant thereto, collectively.

(x) **"Stub Period"** means the cut-off period commencing on January 1, 2005 and ending on the Effective Date.

L. All Exhibits referred to in this Agreement are attached hereto and are incorporated by reference herein. All references to Sections and Articles are to the Sections and Articles of this Agreement.

M. The parties intend to finalize, execute and deliver the MSA on or before the Closing Date, and they further intend that the delivery of a facsimile copy of the MSA, signed in counterparts by Buyer and Seller, to the Closing Agent shall be a concurrent condition to the Closing hereunder.

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I. RECITALS AND AGREEMENTS INCIDENT TO DIVORCE.

1.1 <u>Recitals Incorporated</u>. The foregoing Recitals are incorporated into this Agreement and are made an integral part hereof.

1.2  Amendment of Property Agreement.  Buyer and Seller hereby acknowledge and agree that this Agreement and the transactions hereunder are intended to be and constitute an amendment to the Property Agreement.  In the event of any conflict between this Agreement and the Property Agreement, the terms and provisions of this Agreement shall govern and control.  Except as specifically amended by the terms and provisions of this Agreement, the Property Agreement shall continue to be in full force and effect.

1.3  Transfer of Stock Incident to Divorce.  Pursuant to the terms and provisions of this Agreement, Buyer shall acquire from Seller, and Seller shall transfer to Buyer, Seller's Stock, which Buyer and Seller stipulate and agree is a transfer of property incident to their dissolution of marriage and therefore is governed by Section 1041.  No sale of Seller's Stock to Buyer is effected between the parties under this Agreement.  Seller and Buyer are aware that under Section 1041, the transfer of property for consideration is deemed to be a non-taxable gift to the transferring former spouse.  Accordingly, Seller will not recognize any federal income tax liability on the consideration she receives for the transfer of Seller's Stock, and Buyer's payment of such consideration will not be deductible to Buyer. Buyer further acknowledges and agrees that his basis in the transferred Seller's Stock for federal income tax purposes shall be the Seller's adjusted basis, and accordingly, that he will not receive a step-up in basis.

1.4  Buyer's Indemnification of Seller From Tax Liability. Buyer agrees to (a) report his acquisition of Seller's Stock as a Section 1041 transaction; and (b) indemnify and hold Seller harmless from and against any adverse tax consequences that may be incurred by Seller as a result of Buyer filing any tax returns contrary to the provisions of Sections 1.2 and 1.3 or otherwise violating the terms thereof.

1.5  Relationship of Agreement to MSA.  Buyer and Seller stipulate and agree that nothing in this Agreement is intended to affect or change any of the terms and provisions of the MSA.  Notwithstanding the foregoing, in the event of any conflict between this Agreement and the MSA, the terms and provisions of this Agreement shall govern and control with respect to the subject matter hereof.

1.6  Child Support Under MSA Not Affected by this Agreement.  Seller and Buyer stipulate and agree as follows: (a) that Buyer's acquisition of Seller's Shares shall not be considered to be a change of circumstance for purposes of modifying child support payments under the MSA; (b) that the sums paid to Seller for (i) the acquisition of Seller's Shares; and (ii) the benefits provided pursuant to Section 4.3 hereof shall be excluded from Seller's total earnings in setting child support; and (c) that Buyer's increased earnings as a result of this acquisition of Seller's Shares shall be excluded from his total earnings in setting child support.

## ARTICLE II.  TRANSFER OF SELLER'S STOCK.

2.1  Buyer's Acquisition and Seller's Transfer.  At the Closing, but retroactively effective as of the Effective Date, upon and subject to the terms and conditions hereof, Buyer agrees to acquire, and Seller agrees to transfer, all of Seller's right, title and interest

in and to Seller's Stock. In connection with this transaction, and subject to the further terms and conditions of this Agreement, Seller agrees to relinquish all of her interests in the Corporation and the Insurance Company, including, without limitation, her management rights as an officer and director in those companies retroactively effective as of the Effective Date.

2.2    Consideration For Seller's Stock.  The total consideration that Buyer shall pay to Seller for Seller's Stock shall be Three Million Two Hundred Thousand Dollars ($3,200,000) (the "**Stock Consideration**"), as follows:

2.2.1    Three Million Dollars ($3,000,000) of the Stock Consideration is applicable to Buyer's acquisition of Seller's Dealership Shares; and

2.2.2    Two Hundred Thousand Dollars ($200,000) of the Stock Consideration is applicable to Buyer's acquisition of Seller's Insurance Shares.

2.3    Payment of Consideration.    At Closing, Buyer shall pay Seller the Stock Consideration as follows:

2.3.1    Buyer shall pay Seller the sum of One Million Dollars ($1,000,000) in cash by wire transfer of immediately available funds.

2.3.2    The balance of the Stock Consideration shall be evidenced by a Secured Promissory Note (the "**Promissory Note**") in the face amount of Two Million Two Hundred Thousand Dollars ($2,200,000), made by Buyer payable to the order of Marie B. Peters, Trustee of the Marie B. Peters 2004 Family Trust ("Payee"), which Buyer shall deliver to Seller at Closing. A copy of the Promissory Note is attached hereto as Exhibit "A". The Promissory Note shall be interest-free. Commencing on June 1, 2005, the Promissory Note shall be payable in fifty-one (51) equal monthly installments of Nineteen Thousand Two Hundred Thirty and 77/100 Dollars ($19,230.77), and one (1) final monthly installment of Nineteen Thousand Two Hundred Thirty and 73/100 Dollars ($19,230.73), with each such payment being due on the first day of the calendar month. On October 1, 2009, a one-time payment of Two Hundred Thousand Dollars ($200,000) shall be due, which payment shall be in addition to the monthly installment of $19,230.77 also due on that date. From October 1, 2009 until maturity on April 1, 2011, there shall be no payments due under the Promissory Note. On April 1, 2011, a balloon payment of One Million Dollars ($1,000,000) shall be due. If any payment under the Promissory Note (whether a monthly installment or the final balloon payment) is more than 10 days past due, a late payment fee of three percent (3%) of the past-due amount will be added to the indebtedness under the Promissory Note. In the event of any default in payment or performance under the Promissory Note, the Buyer shall have a period of thirty (30) days from the date that Payee gives written notice of default to cure the same, and Payee shall neither be entitled to accelerate the

maturity, nor to enforce payment of the Promissory Note, nor to enforce the Pledge Agreement or any other remedy that may be available at law or in equity during such curative period so long as Buyer has commenced cure and pursues same during such thirty-day period.

2.3.3 Buyer acknowledges and agrees that he, and not the Corporation, is solely and unconditionally obligated and personally liable for full payment of the Promissory Note.

2.3.4 Payment of the Promissory Note shall be secured by a pledge of the Seller's Dealership Shares (the "**Pledged Stock**"), pursuant to a Pledge Agreement, a copy of which is attached hereto as <u>Exhibit "B"</u>, which Buyer, as "**Pledgor**", shall execute and deliver to the law firm of Robbins, Palmer & Allen, LLP, as "**Pledge Holder**" for the benefit of Payee, as "**Pledgee**".

2.3.5. Buyer may elect to prepay all or part of the outstanding balance of the Promissory Note at any time, and from time to time, without penalty.

2.3.6. By signing below in her capacity as Trustee of the Marie B. Peters 2004 Family Trust, Seller, as the Payee, agrees to and accepts the terms and provisions of the Promissory Note and the Pledge Agreement.

2.4 <u>Resignations of Seller</u>. Upon the Closing Date, but retroactively effective as of the Effective Date, Seller shall resign from all offices and directorships that she holds in the Corporation and in the Insurance Company (including, by way of illustration, but without limitation, the offices of Chief Financial Officer and Secretary of the Corporation and the office of President of the Insurance Company). From and after the Closing Date, Buyer shall have full control of the Corporation and the Insurance Company as sole shareholder of each corporation, and he shall control the appointment of all directors and officers of the Corporation and of the Insurance Company, subject to the further provisions of this Agreement. From and after the Closing Date, Buyer shall serve as President of the Corporation and of the Insurance Company, and he shall have full power and authority to manage those companies' day-to-day operations consistent with applicable statutory law and those companies' bylaws, subject, however, to the further provisions of this Agreement.

## ARTICLE III. COVENANTS OF SELLER AND BUYER.

3.1 <u>Agreements Respecting the Corporation</u>. With respect to the Corporation, Buyer and Seller covenant and agree as follows:

3.1.1 Notwithstanding Seller's resignations set forth in Section 2.4, Seller shall remain as Successor to the Dealer pursuant to the Successor Addendum to the Dealership Agreement dated November 8, 2002, until the Promissory Note and the Falcon Financial Loan are each paid in full.

3.1.2   In the event that Buyer dies before the Promissory Note and the Falcon Financial Loan are each paid in full, Seller immediately shall succeed Buyer as President of the Corporation and shall become the Dealer Principal per the Successor Addendum under the Dealership Agreement. In acting as President and Dealer Principal, Seller shall (a) carry on the Corporation's business and activities diligently and in substantially the same manner as has previously been carried out, and she shall not make or institute any unusual or novel methods of purchase, sale, lease, management, accounting, or operation that vary materially from those methods used by the Corporation as of the Effective Date; (b) enter into business arrangements on terms and conditions generally acceptable to a person in similar management circumstances exercising prudent business judgment; and (c) devote all reasonably necessary time and attention to the Corporation's business and affairs. However, the outstanding Pledged Stock owned by the Buyer at the time of his death will remain the property of Buyer's estate and shall pass pursuant to his estate plan (if any) or, if Buyer dies intestate, pursuant to the statues of descent and distribution, subject to the Pledge Agreement. At the latter to occur of the following events, Seller shall immediately resign as President of the Corporation and Dealer Principal: (i) payment in full of the Falcon Financial Loan; or (ii) payment in full of the Promissory Note.

3.1.3   Buyer, so long as he is the President of the Corporation or controls the Corporation's Board of Directors, shall exert good faith, commercially reasonable efforts to cause the Corporation to comply with each and every covenant, warranty and representation between the Corporation and Seller as set forth in Articles IV, V, VII and VIII.

3.1.4   Seller shall give Buyer written notice of any default by the Corporation under the terms and provisions of Articles IV, V, VII or VIII, which notice shall specify with particularity the facts and circumstances alleged to constitute such default. Buyer shall have forty-five (45) days from the date of his receipt of Seller's written notice of default to cure any such default; provided, however, that Buyer's curative right hereunder is elective and he shall have no affirmative duty to effect such cure. Seller shall not exercise any right or remedy under this Agreement, the Promissory Note, the Pledge Agreement or as otherwise may be available at law or in equity during such forty-five day curative period so long as Buyer has elected to commence cure and pursues same during such forty-five day period.

3.1.5   So long as Buyer remains in compliance with this Agreement, Seller must request access to the Dealership Location from the Buyer prior to entering the Dealership Location. While Buyer is in compliance herewith, Seller shall not enter the Dealership Location without Buyer's prior consent; provided that Buyer shall grant such consent so long as Seller's request for access is reasonably related to the exercise of her inspection and information rights under Section 4.2.

3.1.6 At least two (2) business days prior to the Closing Date, Buyer and Seller shall hold a telephonic Board of Directors meeting, whereby they shall adopt corporate resolutions authorizing, approving and adopting the Corporation's execution and delivery of this Agreement and the Corporation's performance of all terms, covenants, provisions and conditions required to be performed by the Corporation hereunder. To the extent that any provisions of this Agreement benefit Seller, Seller's status as an interested Director with respect to such matters shall be recognized in the minutes of that telephonic meeting, Seller shall abstain from voting thereon, and Buyer, in his capacity as voting Director with respect to such matters shall affirmatively find that the transactions contemplated by this Agreement that benefit Seller are in the bests interests of the Corporation and its shareholders. To the extent that any provisions of this Agreement benefit Buyer, Buyer's status as an interested Director shall be recognized in the minutes of that telephonic meeting, Buyer shall abstain from voting thereon, and Seller, in her capacity as voting Director with respect to such matters, shall affirmatively find that the transactions contemplated by this Agreement that benefit Buyer are in the best interests of the Corporation and its shareholders. The minutes of the telephonic meeting shall so state. Buyer shall act as the Chairman of such telephonic meeting, and Seller shall act as Secretary. Buyer and Seller shall sign the minutes of such telephonic meeting in their stated capacities.

3.1.7 Buyer, within thirty (30) days of his receipt of a detailed invoice specifying services rendered, shall pay Seller's attorneys' fees (and disbursements) to the law firm of Whiting, Fallon & Ross in connection with that firm's representation of Seller in the structuring, negotiation and finalization of the MSA and for that firm's related representation concerning the dissolution of Seller's marriage to Buyer.

3.1.8 Buyer acknowledges that he is in physical possession of Seller's share certificate evidencing Seller's Dealership Shares. Seller hereby authorizes Buyer to deliver said share certificate to the Closing Agent on her behalf, and Buyer hereby agrees to deliver the share certificate evidencing Seller's Dealership Shares to the Closing Agent, on Seller's behalf, at least one (1) business day prior to the Closing Date.

3.2     Agreements Respecting the Insurance Company. With respect to the Insurance Company, Buyer and Seller covenant and agree as follows:

3.2.1 Within ninety (90) days following the Closing Date, Buyer shall cause the Insurance Company to file an election to dissolve with the appropriate governmental authority in the Turks & Caicos Islands. Notwithstanding Seller's resignation as an officer and director of the Insurance Company and the transfer of Seller's Insurance Shares, Seller shall reasonably and in good faith co-operate with Buyer in executing and filing any documents or instruments that may be necessary or appropriate in order to make an election to dissolve the Insurance Company under Turks & Caicos Islands laws, if

appropriate governmental authorities in the Turks & Caicos Islands of a final certificate of dissolution or termination for the Insurance Company, as the case may be. Buyer shall act as the Chairman of such telephonic meeting, and Seller shall act as Secretary. Buyer and Seller shall sign the minutes of such telephonic meeting in their stated capacities.

3.2.7    At least one (1) business day prior to the Closing Date, Seller shall execute and deliver to the Closing Agent the documents requested by Diane Barone, reinsurance company administrator of SOUTHWESTRE, namely:    (a) Seller's resignation as the President and a director of the Insurance Company, signed by Seller; (b) her Indemnity For Lost Certificate, signed by Seller; (c) Stock Transfer Form respecting transfer of 1,250 shares of Insurance Company stock from Seller to Buyer, signed by Seller; and (d) Board of Directors Minutes, signed by Seller, copies of which are attached hereto as Exhibit "I" (collectively, "**Seller's Turks & Caicos Islands Corporate Documents**").

3.2.8    At least one (1) business day prior to the Closing Date, Buyer shall execute and deliver to the Closing Agent the documents requested by Diane Barone, reinsurance company administrator of SOUTHWESTRE, namely: (a) his resignation as Secretary of the Insurance Company, signed by Buyer; (b) his indemnity For Lost Certificate, signed by Buyer; and (c) a copy of the driver's license for the new corporate secretary, duly signed and notarized, copies of which are attached hereto as Exhibit "J" (collectively, "**Buyer's Turks & Caicos Islands Corporate Documents**").

3.2.9    Post-Closing Accounting. No later than ninety (90) days following the Closing Date, the Buyer shall cause SouthwestRE to perform an accounting of the Insurance Company's account number P2017, as designated on SouthwestRE's chart of accounts ("the **Audit Account**"). Such accounting shall be performed in accordance with accounting principles previously employed by SouthwestRE in its preparation of Insurance Company financial reports, consistently applied, and shall cover all prior fiscal years and the Stub-Period, cumulatively. Based on this accounting, SouthwestRE shall prepare a report indicating whether there is a negative balance in the Audit Account (the "**Insurance Company Financial Report**"). If there is a negative balance in said account, the following shall apply:

(a)    The Buyer shall cause SouthwestRE to deliver a copy of the Insurance Company Financial Report to Seller's legal counsel, Robert G. Allen, Esq., of the law firm Robbins, Palmer & Allen, LLP, and to Seller's independent accountant, James Sheehy. Seller shall have a period of forty-five (45) days from her receipt of the Insurance Company Financial Report in order to deliver written notice to the Buyer as to whether she approves the Insurance Company Financial Report as submitted, or whether she objects thereto. In

the event Seller objects thereto, Seller shall state with particularity the grounds for her objection(s).

(b)     If Seller approves the Insurance Company Financial Report as submitted, it shall be conclusive, final and binding on the Buyer and Seller. In this event, (i) subsections 3.2.9(c) through 3.2.9(e) below shall be inapplicable; and (ii) Buyer shall deduct an amount equal to one-half of the negative balance shown on the Insurance Company Stub-Period Financial Report, not to exceed, however, the amount of $15,500 (the "**Offset Amount**") from the next monthly installment payment or payments due to Payee under the Promissory Note.

(c)     If Seller objects to the Insurance Company Financial Report, then within ten (10) business days of the Buyer's receipt of Seller's written notice of objection, Seller and Buyer shall mutually select a Neutral Accountant for the purpose of reviewing the Insurance Company Financial Report and considering Seller's objections thereto.  If Seller and Buyer are able to agree upon an acceptable Neutral Accountant, Seller and Corporation shall share all costs and fees incurred by the Neutral Accountant on a 50-50 basis.

(d)     If Seller and Buyer are unable to agree on a Neutral Accountant, then Seller and Buyer shall each promptly select an independent public accountant that is acceptable to the respective party and Seller shall pay the fees and costs of its designated independent accountant and Buyer shall pay the fees and costs of its designated independent accountant.  The two independent accountants designated by Seller and Buyer shall, within ten (10) business days of their appointment, meet and confer and mutually select a third independent public accountant who has knowledge and experience in accounting matters applicable to automobile dealerships.   The third independent public accountant so appointed shall then be the Neutral Accountant hereunder.  Seller and Buyer shall equally share the fees and costs incurred by this Neutral Accountant.

(e)     Irrespective of the procedure used to designate the Neutral Accountant, the Buyer shall instruct SouthwestRE to reasonably cooperate with the Neutral Accountant and to inform the Neutral Accountant regarding the accounting methods and principles that SouthwestRE employed in preparing the Insurance Company Financial Report.  On or before December 15, 2005, the Buyer and Seller shall cause the Neutral Accountant to prepare and deliver to the Buyer and the Seller the Neutral Accountant's revised Insurance Company Financial Report concerning the Audit Account.  The Neutral Accountant's revised Insurance Company Financial Report shall be conclusive, final and binding upon the Buyer and Seller. If the Neutral Accountant's revised Insurance Company Financial Report shows a negative balance in the Audit Account, Buyer shall deduct the Offset Amount from the next monthly installment payment or payments due to Payee under the Promissory Note.

3.3    Agreements Respecting REH LLC.    With respect to REH LLC, Buyer and Seller covenant and agree as follows:

3.3.1   At the Closing, Buyer and Seller shall cause REH LLC to execute and deliver to the Corporation that certain Amendment of Lease in the form attached hereto as Exhibit "C", which provides, in relevant part, that the Lease is amended as follows:

(a)    The Term (as defined in the Lease) shall expire on August 31, 2020, with the option at the Corporation's election to renew for two (2) additional consecutive five (5) year periods;

(b)    The monthly Base Rent (as defined in the Lease) payable by the Corporation to REH LLC shall remain at $66,673 per month until the earlier of (i) the date the Falcon Financial Loan is paid in full; or (ii) October 1, 2009, whereupon commencing the first day of the succeeding month, the monthly Base Rent shall be reduced to $40,000 (the first "**Adjustment Date**"); subject to rental adjustment at the next Adjustment Date (as defined in clause (c) below);

(c)    Commencing one (1) year after the first Adjustment Date, and every one (1) year thereafter during the Term, and any extension thereof, monthly Base Rent for the Lease year shall be increased by the greater of (i) three percent (3%) of the monthly Base Rental in effect for the month immediately preceding the applicable Adjustment Date, or (ii) the percentage increase, if any, in the Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose California Metropolitan Statistical Area (All Items)(Base Year 1982-84 = 100) published by the U. S. Department of Labor, Bureau of Labor Statistics (the "**CPI**"), measured by comparing the CPI published for the month of June in the calendar year preceding the Adjustment Date with the CPI published for the month of June in the then-current calendar year;

(d)    The Corporation must give REH LLC written notice of its election to exercise a renewal option not less than one hundred eighty (180) days prior to the termination date of the original amended term or the first option period term, as applicable; and

(e)    Monthly Base Rent during each option period will be subject to the same rent escalation provision as set forth in clause (c) above.

3.3.2   Following the Closing, Buyer (and not REH LLC) shall be primarily obligated to pay off the Falcon Financial Loan in accordance with its terms.

3.3.3   Following the Closing, Buyer and Seller shall reasonably co-operate in good faith to cause REH LLC (a) to enter into a collateral security agreement with one or more lenders that provide financing to the Corporation or to Buyer for the purpose of (i) paying off the Falcon Financial Loan on or before its

maturity on October 1, 2009; and (ii) making a loan to Buyer in order to pay-off the Promissory Note on or before its maturity on April 1, 2011; and (b) to execute, acknowledge and deliver any document or instrument reasonably required by a lender described in clause (a) of this Section 3.3.3 with respect to (i) the execution of a collateral security agreement between such lender and REH LLC, or (ii) the creation, perfection or recordation of a lien or security interest encumbering the Dealership Realty or other assets of REH LLC pursuant to such collateral security agreement.

3.3.4   Effective as of the Closing Date, and subject to Buyer's compliance with the terms and conditions of this Agreement, Seller consents to the encumbrance of REH LLC's assets by liens and security interests in favor of the lenders described in Section 3.3.3; and Seller agrees to confirm her consent thereto in writing to any lender described in Section 3.3.3.

3.3.5   Nothing in this Agreement shall be deemed to create any personal liability for Seller in connection with any loan or collateral security agreement contemplated by Section 3.3.3; and Seller shall not be subjected to any personal liability under any collateral security document executed in connection with the loans contemplated by Section 3.3.3 or in connection with the consent contemplated by Section 3.3.4. Buyer shall indemnify and hold harmless Seller from any such personal liability.

3.3.6   If, following the Closing Date, Seller commits a breach of or default in any of her undertakings and agreements set forth in Sections 3.3.3 or 3.3.4, and such breach or default prevents, hinders or delays Buyer's ability to obtain financing necessary or desirable to pay-off the Falcon Financial Loan on or before its stated maturity or to pay-off the $1,000,000 balloon payment due under the Promissory Note on or before its stated maturity, then, in either event: (a) Seller shall indemnify and hold Buyer harmless from and against any claim, demand, loss, liability, damage, cost and expense suffered or incurred by Buyer as a result of Seller's actions; and (b) Buyer shall be excused from making any payments due and owing to Payee under the Promissory Note or this Agreement (and no late fees, penalties, or other sums shall be payable by Buyer to Seller or Payee) for so long as Seller's conduct prevents, hinders or delays Buyer's ability to obtain such financing.

3.3.7   At least one (1) business day prior to the Closing Date, Buyer and Seller shall execute and deliver to the Closing Agent counterparts of the Amendment to Operating Agreement in the form attached hereto as Exhibit "H".

3.3.8   On or immediately after the Closing Date, Buyer shall direct the Corporation's insurance broker to create a new group medical and dental PPO Blue Cross insurance plan that will be carried by REH LLC (the "LLC New Group Plan"). The LLC New Group Plan shall provide coverage at

substantially the same levels of coverage as presently in force with respect to Seller and Jordan Peters under the Corporation-sponsored medical and dental plan presently in effect with respect to Seller. At its inception, the group covered by the LLC New Group Plan will include Seller and Buyer, and will provide dependent coverage for Jordan Peters. Buyer hereby notifies Seller that he intends to "opt out" of this group following institution of the LLC New Group Plan. Until the Promissory Note is paid in full, the Corporation shall pay the premiums for insurance coverage under the LLC New Group Plan for Seller and for Jordan Peters. From and after the full repayment of the Promissory Note, the following shall apply:

(a)     Seller shall be responsible for the payment of all premiums and other costs related to the LLC New Group Plan, except the premium attributable to Jordan Peters, which shall be payable as set forth in clause (b) below. With the exception of premiums attributable to Jordan Peters, Seller shall indemnify, defend, and hold harmless REH LLC, Buyer, the Corporation, and each of their respective heirs, successors, and assigns (collectively, the "**Medical Insurance Indemnitees**") from and against any and all claims, demands, causes of action, losses, liabilities, damages, costs, and expenses arising out of or related to the LLC New Group Plan (collectively, a "**Group Plan Claim**").

(b)     Buyer shall have the option to remove Jordan Peters from coverage under the LLC New Group Plan and transfer him, as a covered insured, to the Corporation's then-existing group medical and dental insurance plan. If Buyer exercises his option to so do, the Corporation shall pay the insurance premiums attributable to Jordan Peters under the Corporation's group medical and dental insurance plan until Jordan Peters graduates from high school.

(c)     If any Group Plan Claim is asserted against one or more of the Medical Insurance Indemnitees, and Seller does not pay such Group Plan Claim in full within thirty (30) days from the date that a Medical Plan Indemnitee gives Seller written notice of such claim, then any and all present and future cash distributions that otherwise would be due and owing to Seller from REH LLC shall be applied first to the repayment of such Group Plan Claim until such claim is paid in full.

## ARTICLE IV. COVENANTS OF SELLER AND CORPORATION.

4.1     Agreements Respecting the Conduct of the Corporation's Business. For so long as any indebtedness remains unpaid to Payee under the Promissory Note, the Corporation and Seller covenant and agree as follows:

4.1.1   The adjusted net working capital of the Corporation shall not fall below $1,000,000; provided, however, that Seller recognizes and acknowledges that

as the business climate changes, adjusted net working capital may fluctuate up or down depending on the cash flow requirements of the business. In the event adjusted net working capital falls below $1,000,000, the Corporation will have the 45 days specified in Section 4.6 to correct any deficiencies and to bring adjusted net working capital into compliance with the requirement of this Section 4.1.1.

4.1.2  The Corporation shall not make any capital expenditure or capital asset purchase outside of its ordinary course of business in excess of Thirty Thousand Dollars ($30,000) (an **"Extraordinary Capital Expenditure"**) without first having obtained the prior written consent of Seller with respect to such Extraordinary Capital Expenditure.  A "capital expenditure" or "capital asset" shall be determined in accordance with generally accepted accounting principles.  The Corporation and Seller stipulate and agree that, among other things, (a) the purchase, sale, lease, trade, or exchange of any automobiles, trucks, motorcycles, boats or other property in connection with the conduct of the dealership business; (b) the taking of any action or expending of any funds pursuant to the Dealership Agreement; (c) the financing of any motor vehicle purchase by any customer of the dealership; (d) the provision of any extended warranty or any insurance or reinsurance to the dealership's customers; (e) the maintenance, repair or replacement of any furniture, fixtures or equipment used in the conduct of the dealership operations; and (f) the expenditure of any funds pursuant to contractual obligations of the dealership (including, by way of illustration but without limitation, the Lease Agreement between the Corporation and REH LLC) shall be deemed to be in the ordinary course of the Corporation's business.

4.1.3  The Corporation shall at all times preserve, renew and keep in full force and effect its corporate existence and its rights and franchises and shall maintain in full force and effect all permits, licenses, trademarks, trade names, approvals, authorizations, leases, and contracts reasonably necessary to carry on its business as presently conducted. Further, the Corporation shall, at all times, comply in all material respects with all laws, rules, regulations, licenses, permits, approvals and orders applicable to it, and it shall duly observe all requirements of any Federal, State or local governmental authority concerning its business and assets. In addition, the Corporation shall duly pay and discharge all taxes, assessments, and governmental charges upon or against it or its properties or assets (collectively, **"Taxes"**), except for Taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Corporation and with respect to which adequate reserves have been set aside on its books.

4.1.4  The Corporation shall keep all properties useful or necessary to the Corporation's business in good repair and condition and from time to time shall make necessary repairs, renewals and replacements thereto so that such properties shall be fully and efficiently preserved and maintained.

4.1.5 The Corporation shall continuously maintain with financially sound and reputable insurers, insurance with respect to the assets of the Corporation against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or substantially similar businesses and similarly situated.

4.1.6 Without the prior written consent of Seller, the Corporation shall not (a) amend its Articles of Incorporation or Bylaws (provided, however, that the following shall be permissible amendments of the Bylaws hereunder: (i) the amendment of the Corporation's Bylaws to provide for a sole director or to increase the authorized directors from two to three, or (ii) the amendment of the Corporation's Bylaws to eliminate Vice President as a mandatory corporate officer); or (b) issue any new capital stock, or any option, warrant, subscription, stock dividend, convertible securities, or other right to acquire or authorize any additional capital stock of the Corporation, to Buyer or to any other person or entity.

4.1.7 The Corporation will carry on its business and activities diligently and in substantially the same manner as has previously been carried out and shall not make or institute any unusual or novel methods of purchase, sale, lease, management, accounting, or operation that vary materially from those methods used by the Corporation as of the Effective Date; provided, however, that nothing in this Section 4.1.7 shall be deemed to restrict (a) Buyer's rights or ability, whether as President, as controlling shareholder or as majority Director, to implement compensation and benefit plans or sales incentive programs or rewards applicable to the Corporation's general manager, sales managers, finance manager, or other key employees (excluding, however, Buyer) that Buyer, in the exercise of his business judgment, deems necessary or desirable to attract, retain and motivate the managerial and other key employees of the Corporation involved in the day-to-day operations of the dealership; (b) the Corporation's right to implement Directors' and Officers' liability insurance coverage in the event the Corporation's shareholder(s) desire to elect one or more outside directors to the Corporation's Board of Directors; or (c) the Corporation's right to purchase key-man life insurance.

4.1.8 The Corporation will use reasonable commercial efforts to preserve its business organization intact and to preserve its present relationships with General Motors, suppliers, customers and others having business relationships with the Corporation for so long as such relationships benefit the Corporation.

4.2 Seller's Information and Inspection Rights. For so long as any indebtedness remains unpaid to Payee under the Promissory Note, the Corporation and Seller covenant and agree as follows:

4.2.1 The Corporation shall promptly deliver to Seller a copy of the Operating Report prepared for the Corporation and submitted to General Motors at the close of each month.

4.2.2 Upon seven (7) business days' prior written notice to the Corporation's Board of Directors, Seller, at her sole cost and expense, shall have full access to the Corporation's books and records, financial statements and tax returns during the Corporation's regular business hours.

4.2.3 Seller, at her sole cost and expense, and subject to the notification requirement set forth in Section 4.2.2, shall have the option for each calendar year during the term of this Agreement to have a CPA firm designated by Seller audit the Corporation's financial books and records during the Corporation's regular business hours.

4.2.4 Within one hundred twenty (120) days after the end of each fiscal year, the Corporation will submit to Seller: (a) a copy of the Corporation's annual financial statement reviewed by the Corporation's independent CPA; (b) a copy of its annual tax return; and (c) a statement certifying the Corporation's compliance with all terms and conditions of this Agreement.

4.2.5 The Corporation shall permit any representative of the Seller, upon seven (7) business days' prior written notice, and during the Corporation's regular business hours, at Seller's sole cost and expense, to inspect, audit and examine the books and records and to inspect the properties of the Corporation in order to verify the Corporation's compliance with the requirements of this Article IV; provided however, that the Corporation may require any such representative to sign a standard proprietary information and non-disclosure agreement in connection therewith as a condition precedent to the representative's exercise of any rights under this Section 4.2.5.

4.3 Seller's Benefit Rights. In consideration of her relinquishment of all rights and offices in the Corporation, the Corporation agrees to provide Seller with the following benefits for so long as any indebtedness remains unpaid to Payee under the Promissory Note:

4.3.1 At Closing, the Corporation shall transfer, without charge to Seller, title to the model year 2000 BMW automobile owned by the Corporation and currently used by Seller. Corporation shall pay any title transfer costs, sales taxes and license fees. Following such transfer of title, Seller shall assume all costs, responsibilities and liabilities associated with vehicle ownership,

including, without limitation, any costs associated with the insurance, repairs, and maintenance of the automobile and future license fees.

4.3.2. Commencing in June 2005, the Corporation shall pay Seller a monthly automobile allowance in the amount of Nine Hundred Dollars ($900) on the 5th day of each month until the Promissory Note is paid in full. When the Promissory Note has been paid in full, Seller shall receive, without charge, title to new current model GMC vehicle of the Seller's selection from the Corporation's inventory (the "**New GMC Vehicle**"). Corporation shall pay any title transfer costs, sales taxes and license fees. Upon transfer of title to the New GMC Vehicle to Seller, Seller shall assume all costs, responsibilities and liabilities associated with vehicle ownership, including, without limitation, any costs associated with insurance, repairs, and maintenance of the automobile and future license fees.

4.3.3 After the Closing Date, Seller shall have the use of an ARCO gasoline credit card provided by the Corporation, and shall have charging privileges on such credit card of up to Three Hundred Fifty Dollars ($350) per month at no cost to Seller. Any charges on said credit card in excess of Three Hundred Fifty Dollars ($350) per month ("**Excess Credit Charges**") shall be paid promptly by Seller, either directly to ARCO, or if not timely paid by Seller to ARCO and the Corporation pays the Excess Credit Charges to ARCO, then Seller shall reimburse the Corporation for such Excess Credit Charges on written demand. If Seller fails to reimburse the Corporation for any Excess Credit Charges paid by the Corporation to ARCO within thirty (30) days of written demand therefor by the Corporation, the Corporation may offset any such unreimbursed Excess Credit Charges against the monthly automobile allowance payable by the Corporation to Seller under Section 4.3.2. Seller's use of this ARCO credit card shall terminate when the Promissory Note has been paid in full.

4.3.4 The Corporation shall pay the premium attributable to Seller and Jordan Peters respecting the LLC New Group Plan until the Promissory Note is paid in full. Additionally, the Corporation shall pay the LLC New Group Plan premiums for Jordan Peters until he graduates from high school, unless Buyer exercises his right after the Promissory Note is repaid to transfer Jordan Peters as an insured under the Company's then-existing group medical and dental insurance plan, in which case the Corporation shall pay the insurance premiums attributable to Jordan Peters under the Corporation's group medical and dental insurance plan until Jordan Peters graduates from high school.

4.3.5 Subject to the further provisions of this subsection 4.3.5, the Corporation shall insure Seller's life under a One Million Dollar ($1,000,000) term life insurance policy naming Jordan Peters as the beneficiary. Within forty-five (45) days following Closing, the Corporation shall provide Seller with a copy of such life insurance policy. This policy shall be maintained in full force

and effect until the Promissory Note is paid in full. The Corporation's duties and obligations under this subsection 4.3.5 are subject to and conditioned upon each of the following: (a) Seller's reasonable cooperation with the Corporation's insurance broker and with the requests of the life insurance company that will issue the policy in question, including without limitation, timely providing all medical and personal information reasonably requested by the insurance carrier and timely submitting to any medical examination that the insurance carrier may require; and (b) the insurance carrier's determination that the Seller is insurable. If Seller is insurable, but the monthly premium charged to issue such term life insurance policy exceeds the sum of Three Hundred Fifty Dollars ($350), the Corporation, at its option, may elect to pay Seller the sum of Three Hundred Fifty Dollars ($350) per month until the Promissory Note is paid in full, in which case, the provision of any life insurance coverage shall be Seller's responsibility.

4.3.6   The Corporation, within thirty (30) days of its receipt of a detailed invoice specifying services rendered, shall pay Seller's attorney's fees (and related disbursements) to the law firm of Robbins, Palmer & Allen, LLP in connection with that firm's representation of Seller in the structuring, negotiation, and closing of the transactions contemplated by this Agreement.

4.4   Repayment of the Falcon Financial Loan.  In the event the Buyer fails to timely repay the Falcon Financial Loan pursuant to Buyer's covenant and agreement in Section 3.3.2, Corporation, as the named guarantor under the Falcon Financial Loan Agreement, shall pay off the Falcon Financial Loan in accordance with its terms, and REH LLC shall not be obligated to repay the Falcon Financial Loan.

4.5   Cancellation of Seller's Share Certificate.  Upon the Closing Agent's delivery to the Corporation of the share certificate representing Seller's Dealership Shares in accordance with Section 10.4.3, the Corporation is authorized and directed to cancel such certificate in its stock transfer ledger book retroactively effective as of the Effective Date.  The Corporation shall issue a new certificate in Buyer's name evidencing the 800 capital shares of Corporation stock that Seller is transferring to Buyer under this Agreement (the "**New 800 Share Certificate**").

4.6   Corporation's Right to Cure.  Seller shall give Corporation written notice of any default by the Corporation under the terms and provisions of this Article IV and/or Articles V, VII or VIII, which notice shall specify with particularity the facts and circumstances alleged to constitute such default. Corporation shall have forty-five (45) days from the date of its receipt of Seller's written notice of default to cure any such default. Seller shall not exercise any right or remedy under this Agreement, the Promissory Note, the Pledge Agreement or as otherwise may be available at law or in equity during such curative period, provided that the Corporation has commenced curative action and pursues same during said 45-day period.

**4.7**    Stub-Period Accounting and Draft K-1.

4.7.1    No later than ninety (90) days following the Closing Date, the Corporation shall cause its independent public accountant to perform an accounting for the Stub-Period. Such Stub-Period accounting shall be performed in accordance with generally accepted accounting principles customarily applied to the automotive dealership industry, consistently applied ("GAAP"); provided however, that notwithstanding GAAP or consistency considerations, for the purpose of this Section 4.7, such accounting shall include all unapplied advertising, floor credits and "push-pull" money applicable to the Stub Period, it being the parties' understanding that the ending balances at December 31, 2004, if any, for unapplied advertising, floor credits and "push-pull" money shall be excluded from this accounting (this last provision is hereinafter referred to as the "**Consistency Proviso**"). Based on this accounting, the Corporation's independent accountant shall generate a balance sheet and income statement for the Corporation respecting the Stub-Period, which shall be prepared in accordance with GAAP, subject, however, to the Consistency Proviso (the "**Stub-Period Financial Statements**"). Based on the Stub-Period Financial Statements, such independent accountant also shall prepare a draft Schedule K-1 for Seller, showing the Seller's pro rata share of corporate items of income, deduction, loss, and credit for the Stub-Period, based on the Seller's share of each such item computed daily according to the number of shares held by Seller on each day of the Stub-Period in accordance with applicable IRC sections and Regs. (including, without limitation, Reg. § 1.1366-1 and Reg. § 1.1377-1) ("**Seller's Draft K-1**"). Within five (5) business days of the independent accountant's finalization of the Stub-Period Financial Statements and Seller's Draft K-1, the Corporation shall cause its independent accountant to deliver the Stub-Period Financial Statements and Seller's Draft K-1 to Seller, with copies to Seller's legal counsel, Robert G. Allen, Esq., of the law firm Robbins, Palmer & Allen, LLP, and to Seller's independent accountant, James Sheehy.

4.7.2    Seller shall have a period of forty-five (45) days from her receipt of the Stub-Period Financial Statements and the Seller's Draft K-1 in order to deliver written notice to the Corporation as to whether she approves the Stub-Period Financial Statements and/or Seller's Draft K-1 as submitted, or whether she objects thereto. In the event Seller objects thereto, Seller shall state with particularity the grounds for her objection(s).

4.7.3    If Seller approves the Stub-Period Financial Statements and Seller's Draft K-1 as submitted, such financial statements and Schedule K-1 shall be conclusive, final and binding on the Corporation and on Seller, and the Corporation covenants and agrees with Seller that the Schedule K-1, as approved by Seller, shall be the final Schedule K-1 that the Corporation will file with the Internal Revenue Service and the California Franchise Tax

Board following the end of the Corporation's current fiscal year with respect to Seller. In this event, Sections 4.7.4 through 4.7.6 below shall be inapplicable.

4.7.4   If Seller objects to the Stub-Period Financial Statements and/or the Seller's Draft K-1, then within ten (10) business days of the Corporation's receipt of Seller's written notice of objection, Seller and the Corporation shall mutually select a Neutral Accountant for the purpose of (a) reviewing the Stub-Period Financial Statements and the Seller's Draft K-1; and (b) considering Seller's objections thereto. If Corporation and Seller are able to agree upon an acceptable Neutral Accountant, Seller and Corporation shall share all costs and fees incurred by the Neutral Accountant on a 50-50 basis.

4.7.5   If Seller and Corporation are unable to agree on a Neutral Accountant, then Seller and Corporation shall each promptly select an independent public accountant that is acceptable to the respective party and Seller shall pay the fees and costs of its designated independent accountant and Corporation shall pay the fees and costs of its designated independent accountant. The two independent accountants designated by Seller and Corporation shall, within ten (10) business days of their appointment, meet and confer and mutually select a third independent public accountant who has knowledge and experience in accounting and tax matters applicable to automobile dealerships. The third independent public accountant so appointed shall then be the Neutral Accountant hereunder. Corporation and Seller shall equally share the fees and costs incurred by this Neutral Accountant pursuant to the provisions of this Section 4.7.

4.7.6   Irrespective of the procedure used to designate the Neutral Accountant, the Corporation shall cause its independent public accountant (a) to provide his work papers used in connection with generating the Stub-Period Financial Statements and the Seller's Draft K-1 to the Neutral Accountant; (b) to reasonably cooperate with the Neutral Accountant; and (c) to inform the Neutral Accountant regarding the Corporation's accounting methods and customary policies and practices, including, by way of illustration but without limitation, policies and practices with respect to any applicable accruals or reserves and any timing differences between book and tax. The Corporation and Seller shall cause the Neutral Accountant, on or before December 15, 2005, to prepare and deliver to the Corporation and the Seller the Neutral Accountant's (x) revised Stub-Period Financial Statements, which shall be prepared in accordance with GAAP, subject to the Consistency Proviso; and (y) revised Seller's Draft K-1, which shall be prepared in accordance with applicable IRC sections and Regs. (including, without limitation, Reg. § 1.1366-1 and Reg. § 1.1377-1). The Neutral Accountant's decision with respect to all accounting and tax matters relating to the Neutral Accountant's revised Stub-Period Financial Statements and revised Seller's Draft K-1 shall be conclusive, final and binding upon the Corporation and Seller. The Corporation covenants and agrees with Seller

that the Neutral Accountant's revised Seller's Draft K-1 shall be the final Schedule K-1 for Seller that the Corporation will file with the Internal Revenue Service and the California Franchise Tax Board following the end of the Corporations current fiscal year.

4.7.7    If the final Stub-Period Financial Statements and Schedule K-1 (as approved by Seller pursuant to subsection 4.7.3 or as final and binding pursuant to subsection 4.7.5 ) indicate that Seller has not received all cash distributions applicable to the Stub-Period to which she is entitled (a "**Distribution Shortfall**"), then within thirty (30) days following the date that the Stub-Period Financial Statements and Schedule K-1 for Seller are finalized (under either subsection 4.7.3 or subsection 4.7.6, as applicable), the Corporation shall issue its check payable to Seller in an amount equal to the Distribution Shortfall.

4.8     Seller's Return of Demonstration Motor Vehicle. On the Closing Date, Seller shall return to the Corporation the demonstration motor vehicle (the "**Demo Vehicle**") that currently is in her possession, which return shall be made in accordance with the provisions of Section 10.5.

4.9     Removal of Seller as a Signatory on the Company's Bank Accounts. At least one (1) business day prior to the Closing Date, Seller shall deliver to Closing Agent the following: (a) a signed instruction letter addressed to Wells Fargo Bank, NA, respecting her removal as an authorized signatory from the Corporation's account no. 0311 792287, and instructing Wells Fargo Bank, NA to close this account and retain such corporate funds in the account as may be necessary or appropriate to cover any checks that may be outstanding as of the Closing Date, the form of which instruction letter is attached hereto as Exhibit "K" (the "**Wells Fargo Letter**"); and (b) any and all other documents, duly signed by Seller, reasonably requested by Wells Fargo Bank, NA in connection with removing the Seller as a signatory on any other account or accounts that the Corporation may maintain with Wells Fargo Bank, NA. The Wells Fargo Letter and the documents referred to in clause (b) are collectively referred to as the "**Wells Fargo Account Documents.**"

## ARTICLE V. CORPORATION'S REPRESENTATIONS AND WARRANTIES TO SELLER.

Corporation represents and warrants to Seller as follows:

5.1     Title to Property Transferred to Seller. At the time of transfer, the Corporation shall have good and marketable title to all property transferred to Seller under the terms and provisions of Section 4.3, free and clear of any liens, encumbrances, security interests, options, restrictions, charges or adverse claims. The Corporation has full power and authority to transfer such property to Seller pursuant to the terms of this Agreement without obtaining the consent or approval of any other person, entity or governmental authority.

5.2    Dealer Agreement. The Dealer Agreement is in full force and effect, and to the best of Corporation's actual knowledge, there is no default or event that, with notice or lapse of time or both, would constitute a default by any party to the Dealer Agreement.

## ARTICLE VI.  SELLER'S REPRESENTATIONS AND WARRANTIES TO BUYER.

Seller warrants and represents to Buyer that (a) she is the owner, beneficially and of record, of all of Seller's Shares; (b) the Seller's Dealership Shares are the only shares of stock that she owns in the Corporation, and she does not have any other stock or ownership rights in the Corporation, including, without limitation, options, warrants, convertible debt instruments, or any other shareholder rights of a similar or dissimilar nature; (c) the Seller's Insurance Shares are the only shares of stock that she owns in the Insurance Company, and she does not have any other stock or ownership rights in the Insurance Company, including, without limitation, options, warrants, convertible debt instruments, or any other shareholder rights of a similar or dissimilar nature; (d) she has good and marketable title to Seller's Stock, free and clear of any liens, encumbrances, security interests, options, restrictions, charges or adverse claims; and (c) she has full power and authority to transfer Seller's Stock to Buyer pursuant to the terms of this Agreement without obtaining the consent or approval of any other person, entity or governmental authority.

## ARTICLE VII.  MUTUAL REPRESENTATIONS AND WARRANTIES.

Each party hereto represents to the other parties hereto as follows:

7.1    Power and Authority; Enforceability. Each party hereto has full right, power and authority to enter into this Agreement and to perform its obligations hereunder.  No approvals or consents by any person, entity or governmental authority are required in order for this Agreement to be effective and binding upon the parties hereto.  This Agreement has been duly and validly executed and delivered by each party, and, upon execution and delivery by the other parties hereto, this Agreement constitutes the legal, valid and binding obligation of each party, enforceable against each party in accordance with its terms, except as the enforceability of this Agreement may be subject to or limited by (a) bankruptcy, insolvency, reorganization, arrangement, moratoria or other similar laws relating to the rights of creditors generally; and (b) general principles of equity, regardless of whether considered in a proceeding in equity or at law.

7.2    No Litigation. To the best of each party's current actual knowledge, there are no material legal actions, suits, or proceedings pending before any court or any governmental body or authority, or threatened, pertaining to the transactions contemplated by this Agreement or to their consummation.

7.3    Accuracy of Representations and Warranties. No representation or warranty made by a party to any other party hereto that is contained in this Agreement or in any document to be furnished by a party to any other party hereto in connection with this Agreement contains or will contain any untrue statement of a material fact, or

omits or will omit to state a material fact necessary to prevent the statements from being misleading.

7.4 No Insolvency. Each party hereto is not Insolvent, and the consummation of the transactions contemplated by this Agreement will not render a party hereto Insolvent.

7.5 Agreement will not Cause Breach or Violation. To the best of each party's current actual knowledge, the consummation of the transactions contemplated by this Agreement will not result in or constitute any of the following: (a) a default or an event that, with notice or lapse of time or both, would be a default under or breach of any organizational document of the Corporation or Insurance Company (including, without limitation, any articles of incorporation or similar charter document, any bylaws or any shareholder agreements), any contract, lease, license, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, or other agreement, instrument, or arrangement to which any party hereto is bound or by which any property of any party hereto is bound; (b) an event that would permit any lender or other third party to terminate any agreement or to accelerate the maturity of any indebtedness or other obligation of a party hereto; or (c) the creation or imposition of any lien, security interest, charge, or encumbrance on any of the properties of a party hereto (other than as expressly contemplated by this Agreement).

## ARTICLE VIII. INDEMNIFICATION OF SELLER.

From and after the Closing Date, retroactively effective as of the Effective Date, Buyer and the Corporation, jointly and severally, shall indemnify, defend, and hold Seller harmless from and against any and all claims which arise, resulting from, or relate to Buyer's operation of the business of the Corporation after the Closing Date and from any corporate tax liabilities of the Corporation applicable to any period after the Effective Date, including, but without limitation, any such corporate tax liabilities resulting from an IRS audit or California Franchise Tax Board audit of the Corporation. From and after the Closing Date, retroactively effective as of the Effective Date, Buyer shall indemnify, defend, and hold Seller harmless from and against any and all claims which arise, result from, or relate to Buyer's operation of the business of the Insurance Company after the Closing Date and from any corporate tax liabilities of the Insurance Company applicable to any period after the Effective Date, including, but without limitation, any such corporate tax liabilities resulting from an audit of the Insurance Company performed by the IRS, the California Franchise Tax Board, or by the governmental taxing authorities of the Turks & Caicos Islands.

## ARTICLE IX. CONDITIONS TO CLOSING.

9.1 Buyer's Conditions Precedent. The obligations of Buyer to acquire the Seller's Stock, to perform his other undertakings under this Agreement, and to close the transactions contemplated hereby are subject to the satisfaction on or before the Closing Date of each of the conditions set forth in this Section 9.1. Buyer, at his sole option, may waive any and all of these conditions in whole or in part, and proceed to Closing:

9.1.1 All Seller's representations and warranties as set forth in Articles VI and VII shall be true in all material respects on the Reference Date, the Effective Date, and on and as of the Closing Date.

9.1.2 The Seller shall have performed, satisfied, and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by her on or before the Closing Date (including, by way of illustration, but without limitation, the timely delivery of all documents and instruments to the Closing Agent that are required to close the transactions contemplated by this Agreement).

9.1.3 During the period from the Reference Date to the Closing Date, (a) there have been no material adverse changes in the financial condition or the results of operations of the Corporation, and the Corporation shall not have sustained any material loss or damage to its assets, whether or not insured, that materially affects its ability to conduct a material part of its business; and (b) no bankruptcy, insolvency or receivership proceedings have been filed by or against the Seller or the Corporation or any of their respective assets.

9.1.4 No action, suit, or proceeding before any court or governmental body or authority, pertaining to the transactions contemplated by this Agreement shall have been instituted or threatened.

9.2 **Seller's Conditions Precedent.** The obligations of Seller to transfer the Seller's Shares, to perform her other undertakings under this Agreement, and to close the transactions contemplated hereby are subject to the satisfaction on or before the Closing Date of each of the conditions set forth in this Section 9.2. Seller, at her sole option, may waive any and all of these conditions in whole or in part, and proceed to Closing:

9.2.1 All Buyer's and Corporation's representations and warranties as set forth in Articles V and VI shall be true in all material respects on the Reference Date, the Effective Date, and on and as of the Closing Date.

9.2.2 Buyer and Corporation shall have performed, satisfied, and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by him or it on or before the Closing Date (including, by way of illustration, but without limitation, the timely delivery of all documents and instruments to the Closing Agent that are required to close the transactions contemplated by this Agreement).

9.2.3 During the period from the Reference Date to the Closing Date, (a) there have been no material adverse changes in the financial condition or the results of operations of the Corporation, and the Corporation shall not have sustained any material loss or damage to its assets, whether or not insured, that materially affects its ability to conduct a material part of its business;

and (b) no bankruptcy, insolvency or receivership proceedings have been filed by or against the Buyer or the Corporation or any of their respective assets.

9.2.4　No action, suit, or proceeding before any court or governmental body or authority, pertaining to the transactions contemplated by this Agreement shall have been instituted or threatened.

9.3　<u>Buyer's and Seller's Condition Concurrent.</u>　The obligations of both Buyer and Seller to perform their respective undertakings under this Agreement and to close the transactions contemplated hereby are subject to the negotiation, finalization, execution and delivery of the MSA on or before the Closing Date.　This condition concurrent <u>may not</u> be waived, in whole or in part, by either Buyer or Seller.

## ARTICLE X. THE CLOSING.

10.1　<u>Time and Place</u>.　The Closing shall take place on the Closing Date at the offices of the Closing Agent, 1901 Harrison Street, Suite 1550, Oakland, California 94612.

10.2　<u>Closing Agent's Instructions</u>.　Unless otherwise agreed to by the parties in writing, the Closing shall be accomplished by means of letters of instruction delivered to the Closing Agent by legal counsel for each party (a **"Closing Instruction Letter"**), which Closing Instruction Letters shall be accompanied by the transmission of the documents, instruments and funds that the applicable party is required to deliver pursuant to Section 10.3　The delivery of such documents, instruments and funds under cover of such Closing Instruction Letters shall constitute a conditional delivery.　Upon the Closing Agent's receipt of the conditional delivery of all documents, instruments or funds necessary for Closing, the Closing Agent, without any further written or oral instructions being necessary from any party hereto, is unconditionally authorized and directed to deliver to each party the documents, instruments and (if applicable) funds to which that party in entitled pursuant to the terms of Section 10.4.　In the event the Closing Agent has any questions or concerns regarding (i) whether any Article IX conditions precedent or concurrent to Closing have been satisfied or waived (to the extent waiver is permissible hereunder), or (ii) whether any other requirement to Closing set forth in this Agreement or in any party's Closing Instruction Letter has been satisfied or waived, which questions or concerns are not put to rest to the Closing Agent's absolute satisfaction (which shall be determined in the exercise of Closing Agent's sole discretion); or in the event the parties hereto give conflicting instructions to, or make conflicting demands upon the Closing Agent, then in any such events, the Closing Agent is authorized and directed to return to the appropriate party all documents, instruments and funds that each party has delivered to the Closing Agent pursuant to this Agreement.　Following such return by the Closing Agent, the Closing Agent shall have no further duties, responsibilities or liabilities to the parties.

10.3　<u>Deliveries to Closing Agent.</u>　The parties agree to commence delivery of the following listed documents and instruments to the Closing Agent as soon as possible on and after the Reference Date; and further agree that in all events the following shall be

delivered to the Closing Agent no later than May 27, 2005 (unless another delivery date is specified below with respect to a particular item):

10.3.1  Seller shall deliver or cause to be delivered:

(a)  Her original share certificate or certificates evidencing all of Seller's Insurance Shares. In the event Seller has lost or misplaced any such share certificate(s), Seller shall deliver, in lieu of any such lost or misplaced certificate, a Lost Securities Indemnity Agreement in form and substance reasonably satisfactory to Buyer and Buyer's legal counsel.

(b)  A Stock Assignment Separate from Certificate for each share certificate evidencing the Seller's Dealership Shares and for each share certificate evidencing the Seller's Insurance Shares, in the forms of Exhibits "D-1" and "D-2" hereto, duly signed in blank by Seller.

(c)  Her original letter of resignation whereby she resigns all offices and directorships held in the Corporation and the Insurance Company retroactively effective as of the Effective Date, in the form of Exhibit "E" hereto, duly signed by Seller.

(d)  An original copy of the Minutes of the Board of Directors of the Corporation described in Section 3.1.6 duly signed by Seller as Secretary; and an original copy of the Minutes of the Board of Directors of the Insurance Company described in Section 3.2.6 duly signed by Seller as Secretary.

(e)  An original Assignment, in the form of Exhibit "F" hereto, of any claims, rights or receivables that she holds with respect to the Insurance Company duly signed by Seller.

(f)  Two (2) execution copies of the original Amendment of Lease, in the form of Exhibit "C" hereto, duly signed in counterpart by Seller in her capacity as a member of REH LLC.

(g)  An original Amendment to Operating Agreement in the form of Exhibit "H" hereto, duly signed in counterpart by Seller in her capacity as a member of REH, LLC.

(h)  Two (2) execution copies of the Pledge Agreement, in the form of Exhibit "B" hereto, duly signed in counterpart by Payee.

(i)  On the Closing Date, a facsimile final execution copy of the MSA, duly signed in counterpart by Seller.

(j)     Seller's Turk & Caicos Island Corporate Documents duly signed by Seller, in the form of Exhibit "I" hereto.

(k)     The Wells Fargo Letter, duly signed by Seller, in the form of Exhibit "K" hereto, and any other requested Wells Fargo Account Documents, duly signed by Seller.

(l)     Her counsel's original executed Closing Instruction Letter.

10.3.2 Buyer shall deliver or cause to be delivered:

(a)     On the Closing Day, by wire transfer of immediately available funds, One Million Dollars ($1,000,000).

(b)     The original Promissory Note, in the form of Exhibits "A" hereto, duly signed by Buyer.

(c)     Two (2) execution copies of the original Pledge Agreement, in the form of Exhibit "B" hereto, duly signed in counterpart by Buyer.

(d)     A Stock Assignment Separate from Certificate for the New 800 Share Certificate, in the form of Exhibit "G" hereto, duly signed in blank by Buyer.

(e)     An original copy of the Minutes of the Board of Directors of the Corporation described in Section 3.1.6 duly signed by Buyer as Chairman; and an original copy of the Minutes of the Board of Directors of the Insurance Company described in Section 3.2.6 duly signed by Buyer as Chairman.

(f)     Two (2) execution copies of the original Amendment of Lease, in the Form of Exhibit "C" hereto, duly signed in counterpart by Buyer in his capacity as a member of REH LLC.

(g)     An original Amendment to Operating Agreement, in the form of Exhibit "H" hereto, duly signed in counterpart by Buyer in his capacity as a member of REH, LLC.

(h)     On Seller's behalf, and pursuant to Section 3.1.8, the original share certificate or certificates evidencing all of Seller's Dealership Shares.

(i)     Buyer's Turks & Caicos Island Corporate Documents, duly signed by Buyer, or any other appropriate party, in the form of Exhibit "J" hereto.

(j)     On the Closing Date, a facsimile final execution copy of the MSA, duly singed in counterpart by Buyer.

(k)     His counsel's original executed Closing Instruction Letter.

10.3.3 Corporation shall deliver or cause to be delivered:

(a)     The original New 800 Share Certificate.

(b)     Two (2) execution copies of the original Amendment of Lease, in the Form of Exhibit "C" hereto, duly signed in counterpart by the Corporation.

(c)     California Department of Motor Vehicles title transfer documents sufficient to transfer title to the model year 2000 BMW automobile currently driven by Seller into Seller's name as the legal owner of the vehicle.

(d)     Its counsel's original executed Closing Instruction Letter.

10.3.4 Seller shall cause Pledge Holder to deliver two (2) execution copies of the original Pledge Agreement, in the form of Exhibit "B" hereto, duly signed in counterpart by Pledge Holder.

10.4     Closing Procedures and Deliveries.  Once Closing Agent is in receipt of all documents, instruments and funds described in Section 10.3, Closing Agent shall close the asset transfer transaction contemplated by this Agreement in the following manner, with all deliveries to the respective parties being accomplished concurrently:

10.4.1 Closing Agent shall deliver to Seller:

(a)     One Million Dollars ($1,000,000).

(b)     The original Promissory Note duly signed by Buyer.

(c)     California Department of Motor Vehicles title transfer documents sufficient to transfer title to the model year 2000 BMW automobile currently driven by Seller into Seller's name as the legal owner of the vehicle.

(d)     Counterpart originals of the Amendment to Lease duly signed by Buyer and Corporation.

(e)     A counterpart original of the Amendment to Operating Agreement duly signed by Buyer.

(f) Counterpart originals of the Pledge Agreement, duly singed by Buyer and Pledge Holder.

10.4.2 Closing Agent shall deliver to Buyer:

(a) Seller's original share certificate(s) evidencing all of Seller's Insurance Shares, or, if applicable, the original Lost Securities Indemnity Agreement signed by Seller applicable to such share certificate(s).

(b) The original signed Stock Assignment Separate from Certificate for each share certificate evidencing the Seller's Insurance Company Shares.

(c) All original signed copies of the Minutes of the Board of Directors of the Insurance Company described in Section 3.2.6.

(d) Seller's original, signed letter of resignation whereby she resigns all offices and directorships held in the Corporation and the Insurance Company retroactively effective as of the Effective Date.

(e) Seller's original, signed Assignment of any claims, rights or receivables that she holds with respect to the Insurance Company.

(f) Counterpart originals of the Amendment to Lease duly signed by Seller and Corporation.

(g) A counterpart original of the Amendment to Operating Agreement duly signed by Seller.

(h) Counterpart originals of the Pledge Agreement, duly signed by Payee and Pledge Holder.

(i) Executed originals of (1) Seller's Turks & Caicos Islands Corporate Documents, and (2) Buyer's Turks & Caicos Island Corporate Documents.

10.4.3 Closing Agent shall deliver to the Corporation:

(a) Counterpart originals of the Amendment to Lease duly signed by Seller and Buyer.

(b) All original signed copies of the Minutes of the Board of Directors of the Corporation described in Section 3.1.6.

(c) Seller's original share certificate or certificates evidencing all of Seller's Dealership Shares, or if applicable, Seller's signed Lost Securities Indemnity Agreement with respect thereto.

(d) Seller's signed Stock Assignment Separate from Certificate for each share certificate evidencing the Seller's Dealership Stock.

(e) The Wells Fargo Account Documents duly signed by Seller.

10.4.3 Closing Agent shall deliver to the Pledge Holder:

(a) The original Pledge Agreement duly signed in counterpart by Buyer and Payee.

(b) The New 800 Share Certificate.

(c) A Stock Assignment Separate from Certificate for the New 800 Share Certificate, duly signed in blank by Buyer.

10.5   Seller's Delivery to Corporation.   On the Closing Date, Seller shall return to the Corporation the Demo Vehicle and all keys thereto.  Corporation will pick up the Demo Vehicle at Seller's address set forth in Section 11.4.

10.6   GMAC Certified Copy of Board Resolutions.   At least two (2) business days before the Closing Date, Seller and Buyer jointly shall sign the document entitled "Certified Copy of Resolution of Board of Directors of Central Valley Buick, Olds, Pontiac-GMC, Inc." in the form required by GMAC (the "**GMAC Resolution**"), and Buyer is hereby authorized to deliver this document, as jointly signed, to GMAC prior to the Closing.  Seller understands that Buyer is obtaining $500,000 of the cash consideration payable to Seller at Closing from a loan made by the Corporation to Buyer, and that the ultimate source of these funds is a loan from GMAC to the Corporation in said amount, evidenced by the revolving credit agreement and collateralized by the security described in the GMAC Resolution.

## ARTICLE XI.  GENERAL PROVISIONS.

11.1   Further Acts.  Each party to this Agreement agrees to perform any further acts and to execute and deliver any further documents or instruments that reasonably may be necessary to carry out the provisions of this Agreement.

11.2   Amendment.  The provisions of this Agreement may be waived, altered, amended, or repealed, in whole or in part, only on the written consent of all parties to this Agreement.

11.3   Successors.  This Agreement shall be binding on, and shall inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

11.4   Service of Notice.  All notices, requests, demands, or other communications under this Agreement shall be in writing and shall be deemed to have been duly given if in writing

and either delivered personally, sent by air courier service, or mailed by postage prepaid registered or certified U.S. mail, return receipt requested, to the addresses designated below or such other addresses as may be designated in writing by notice given hereunder, and shall be effective upon personal delivery thereof or upon delivery by registered or certified U.S. mail or one business day following deposit with an air courier service:

| | |
|---|---|
| If to Seller: | Marie B. Peters<br>2971 Deer Meadow Drive<br>Danville, CA 94506 |
| With a Copy to: | Robert G. Allen, Esq.<br>Robbins, Palmer & Allen, LLP<br>1901 Harrison Street, Suite 1550<br>Oakland, CA 94612 |
| If to Buyer: | Michael G. Peters<br>1190 S. Main Street<br>Manteca, CA 95337 |
| With a Copy to: | Richard C. Conway, Esq.<br>Kahn, Soares & Conway, LLP<br>219 N. Douty Street<br>Hanford, CA 93230 |
| If to Corporation: | Central Valley Buick, Olds, Pontiac-GMC Inc.<br>Manteca Auto Plaza<br>1190 S. Main Street<br>Manteca, CA 95337 |
| With a Copy to: | Richard C. Conway, Esq.<br>Kahn, Soares & Conway, LLP<br>219 N. Douty Street<br>Hanford, CA 93230 |

11.5  <u>Attorney Fees.</u>  If any party hereto prevails against another party hereto in a legal action concerning any part of this Agreement, such prevailing party shall be entitled to reasonable attorneys' fees and costs connected with such action in addition to any other recovery or relief.

11.6  <u>Survival of Representations and Obligations.</u>  All representations, warranties, covenants, and agreements of the parties contained in this Agreement shall survive the completion of any and all performance of the transactions contemplated by this Agreement for a period of two (2) years following such performance.

11.7  <u>No Broker</u>.  Each of the parties represents and warrants that it has dealt with no broker or finder in connection with the transactions contemplated by this Agreement and, insofar as such party knows, no broker or other person is entitled to any commission or finder's fee by reason of this Agreement or any transaction contemplated in this Agreement.

11.8  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, and understanding of the parties. No supplement or modification of this Agreement shall be binding unless executed in writing and signed by the parties to be charged therewith.

11.9  <u>Applicable Law</u>.  This Agreement shall be construed in accordance with, and governed by, the laws of the State of California.

11.10  <u>Time of the Essence</u>.  Time is of the essence of all provisions of this Agreement in which time is a factor.

11.11  <u>Counterparts</u>. This Agreement may be executed in three or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.12  <u>Interpretation</u>.   If any provision of this Agreement, or the application thereof to any person or circumstance, shall to any extend be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  Wherever used in this Agreement, the singular or plural number, and the male, female or neuter gender, shall each be deemed to include the other as the context requires.

11.13.  <u>Waiver</u>. No waiver by any party hereto at any time of any breach of or non-compliance with, any condition or provision of this Agreement to be performed by any other party hereto may be deemed a waiver of a similar or dissimilar provision or condition at the same time or at any prior or subsequent time.

11.14  <u>Captions</u>.  The Article and Section captions used in this Agreement are for convenience of reference only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Agreement.

11.15  <u>Approvals or Consents</u>.  Whenever the approval or consent of a party is required under the terms of this Agreement, the party required to give such approval or consent shall not unreasonably withhold, condition or delay the giving thereof.

11.16  <u>Effective as of the Effective Date</u>.  So long as the Closing Date occurs on a date mutually acceptable to the parties (but in no event later than May 31, 2005, as the Closing Date may be extended by mutual written agreement), all of Seller's right, title and interest in and to the

Corporation and the Insurance Company, all offices and directorships held by Seller in the Corporation and Insurance Company, all of Seller's salary and benefits, all of Seller's dividend rights, all of Seller's distribution and allocation rights concerning items of income, deduction, loss or credit, and any other forms of compensation or financial benefit applicable to Seller (other than those that are expressly provided for in Article IV), which are derived from or attributable to the Corporation and the Insurance Company, shall cease retroactively as of the Effective Date.

11.17  Termination for Failure of Condition.

11.17.1    In the event any of the conditions precedent set forth in Section 9.1 are not satisfied or waived on or before the Closing Date, Buyer may elect to terminate this Agreement by giving Seller and Closing Agent written notice of its election to terminate this Agreement. Following such written notice of termination, the parties shall have no further obligations or liabilities under this Agreement, and the Closing Agent immediately shall return to the appropriate party all documents, instruments and funds that the applicable party has delivered to the Closing Agent pursuant to this Agreement. Following such return by the Closing Agent, the Closing Agent shall have no further duties, responsibilities or liabilities to the parties.

11.17.2    In the event any of the conditions precedent set forth in Section 9.2 are not satisfied or waived on or before the Closing Date, Seller may elect to terminate this Agreement by giving Buyer and Closing Agent written notice of its election to terminate this Agreement. Following such written notice of termination, the parties shall have no further obligations or liabilities under this Agreement, and the Closing Agent immediately shall return to the appropriate party all documents, instruments and funds that the applicable party has delivered to the Closing Agent pursuant to this Agreement. Following such return by the Closing Agent, the Closing Agent shall have no further duties, responsibilities or liabilities to the parties.

11.17.3    In the event the condition concurrent set forth in Section 9.3 is not satisfied on or before the Closing Date (which condition concurrent may not be waived by either party), then either Buyer or Seller may elect to terminate this Agreement by giving the other party and the Closing Agent written notification of its election to terminate this Agreement. Following such written notice of termination, the parties shall have no further obligations or liabilities under this Agreement, and the Closing Agent immediately shall return to the appropriate party all documents, instruments and funds that the applicable party has delivered to the Closing Agent pursuant to this Agreement. Following such return by the Closing Agent, the Closing Agent shall have no further duties, responsibilities or liabilities to the parties.

[Signatures on Following Page]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Reference Date.

**SELLER:**

MARIE B. PETERS, individually and as Trustee of the Marie B. Peters 2004 Family Trust

**BUYER:**

MICHAEL G. PETERS

**CORPORATION:**

CENTRAL VALLEY BUICK, OLDS, PONTIAC-GMC INC., A CALIFORNIA CORPORATION

By:_____
       MICHALE G. PETERS,
       President

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Reference Date.

**SELLER:**

_____

MARIE B. PETERS, individually
and as Trustee of the Marie B. Peters
2004 Family Trust

**BUYER:**

_____
MICHAEL G. PETERS

**CORPORATION:**

CENTRAL VALLEY BUICK, OLDS,
PONTIAC-GMC INC., A CALIFORNIA
CORPORATION

By:_____
MICHALE G. PETERS,
President
